07 2325

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CORRECTION OFFICER BEATRICE ADAMS, CORRECTION OFFICER NINA CASTLEBERRY, CORRECTION OFFICER MARIA MONCHE, CORRECTION OFFICER TINA O'BRIEN and CORRECTION OFFICER ELDORA QUICK<br><br>Plaintiffs,<br><br>-against-<br><br>THE CITY OF NEW YORK; NEW YORK CITY DEPARTMENT OF CORRECTION MARTIN F. HORN, individually and in his capacity as Commissioner of the New York City Department of Correction; Warden PETER CURCIO; Deputy Wardens ROBERT CRIPPS, CARMINE LA BRUZZO, JOSE MATOS, RAPHAEL OLIVO; Assistant Deputy Warden BRENDA EMERY; Captains MATTHEW BOYD, AMANDA CARMONA, ALLISON CASANOVA, JANET RUSSELL, JOSEPH RUSSO; Correction Officer ROBERT ROHR and Dr. FAOUZIA BAROUCHE<br><br>Defendants. | ECF CASE<br><br>Civil Action No.<br><br>Date Filed:<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

IRIZARRY, J.

REYES, M.J

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUN 08 2007 ★
BROOKLYN OFFICE

Plaintiffs Correction Officers Beatrice Adams, Nina Castleberry, Maria Monche, Eldora Quick and Tina O'Brien (hereinafter referred to as "the Plaintiffs" or "Plaintiffs"), by and through their attorneys, EGAN LAW FIRM, allege for their complaint against Defendants City of New York ("City"), New York City Department of Correction ("DOC"), Martin F. Horn, Peter Curcio, Robert Cripps, Carmine La Bruzzo, Jose Matos, Raphael Olivo, Brenda Emery, Matthew Boyd, Amanda Carmona, Allison Casanova, Janet Russell, Joseph Russo, Robert Rohr and Dr. Faouzia Barouche as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this action to challenge a pattern and practice of employment discrimination and harassment on the basis of sex and race by the New York City Department of Correction ("DOC") in violation of Title VII of the Civil Rights Act

of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), and the Civil Rights Act of 1871, as amended in 1991, 42 U.S.C. § 1983; the New York Constitution; the New York State Human Rights Law, N.Y Exec. Law § 296; the New York City Human Rights Law, 1 New York City Administrative Code, 8-101 and the New York City Charter, Chapter 35. The action seeks declaratory and injunctive relief and compensatory and punitive damages both to secure future protection and to redress the past deprivation of rights secured to Plaintiffs under these local, state and federal laws.

2. Defendants have engaged in a pattern and practice of discrimination and harassment against female employees of color on the basis of sex and race by, inter alia: (a) male supervisors sexually harassing female correction officers of color; (b) condoning sexual harassment by male supervisors of female correction officers of color; (c) maintaining and allowing a hostile work environment, including but not limited to demanding sexual favors in return for improvements in working conditions and denying such work conditions when sexual favors were not granted; (d) treating female correction officers, but not similarly situated male correction officers, in a hostile and demeaning fashion on the job; (e) engaging in discriminatory treatment of female correction officers through (i) unfounded and unwarranted disciplinary charges; (ii) assigning female correction officers to non-preferred posts and tours; (iii) denying overtime to female correction officers who desire overtime and imposing overtime on female correction officers who do not want to work overtime (iv) giving male correction officers priority with respect to requested days off, and (v) imposing unfounded and unwarranted disciplinary penalties upon female correction officers and especially those who have challenged DOC's discriminatory practices, policies and customs.

3. DOC's disciplinary and assignment practices delegate to supervisory officials substantial authority to make discretionary decisions about discipline, assignments, and other work-related terms, conditions and benefits that is exercised in a

discriminatory manner and has a disparate impact on female DOC employees of color in general and specifically on female correction officers of color. Defendants have treated and continue to treat female correction officers differently from male correction officers in the application of the disciplinary rules, work assignments, and other terms, conditions and benefits of employment by DOC. In addition, Defendants have engaged in a pattern and practice of retaliating against female correction officers and others who protest or oppose such discriminatory acts and/or refuse to grant male supervisors sexual favors.

4.      Plaintiffs are female correction officers of color who have been subjected to employment discrimination on the basis of sex and race, including but not limited to demands for sexual favors, a hostile work environment, demeaning radio transmissions, unwarranted disciplinary charges, assignment to non-preferred posts and to non-desirable tasks, denial of overtime and forced overtime, denial of requested days off, and retaliation for complaining about their discriminatory treatment.

5.      Plaintiffs seek declaratory and injunctive relief including but not limited to: (a) a judgment declaring that the policies, practices and/or customs described herein violate federal, state, and local laws; (b) enjoining continued use of Defendants' discriminatory policies and practices; (c) the expungement of all disciplinary records of Plaintiffs that have resulted from Defendants' discriminatory policies and practices; (d) damages to make whole Plaintiffs who have suffered lost wages, lost overtime wages including "comp" time, wages from promotion, and benefits due to Defendants' discriminatory and retaliatory actions; and (e) compensatory damages and punitive damages for the harm suffered as a result of these unlawful acts.

## JURISDICTION AND VENUE

6.      The jurisdiction of this Court is invoked pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e-5(f)(3),  28 U.S.C. §§ 1331 and 1343(3), and 28 U.S.C. § 1367(a) for claims arising

under the New York State Human Rights Law and the New York City Human Rights Law, based on the doctrine of supplemental jurisdiction in that such claims arise from a common nucleus of operative fact and are so intertwined with other matters pending before the Court as to make exercise of supplemental jurisdiction appropriate.

7.    Plaintiffs have fully complied with all prerequisites to jurisdiction in this Court under Title VII. This action is founded on Plaintiffs' employment discrimination charges that were timely filed at the United States Equal Employment Opportunity Commission ("EEOC"). The EEOC referred the charges of each plaintiff to the United States Department of Justice which issued right to sue letters respecting the claims of each plaintiff. This lawsuit is commenced within ninety (90) days of receipt by the Plaintiffs of notices of right to sue from the United States Department of Justice.

8.    Venue is properly placed in the Eastern District of New York under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) in that a substantial part of the events giving rise to this claim arose in this district, and records relevant to the practices complained of herein are located in this district.

## PARTIES

9.    Plaintiff Beatrice Adams is an African American female correction officer who has been employed by DOC for approximately 16 years. She was assigned to Rikers Island Security Unit ("RISU") in or about 2001 and has worked at RISU from in or about 2001 through the present.

10.    Plaintiff Nina Castleberry is an African American female correction officer who has been employed by DOC for approximately 16 years. She was assigned to RISU in or about 2000 and has worked at RISU from in or about 2000 through the present.

11.    Plaintiff Maria Monche is a female correction officer of Hispanic origin who has been employed by DOC for approximately 17 years. During that time, she worked at

the Robert N. Davoren Center ("RNDC") until in or about March 2006, when she was placed on disability leave for hypertension and diagnosed as also suffering from stress and acute anxiety. At present, Officer Monche is on disability retirement.

12. Plaintiff Tina O'Brien is an African American female correction officer who has been employed by DOC for approximately 17 years. She was assigned to RISU in or about June, 2006 and has since been transferred back to North Infirmary Command ("NIC") where she is presently employed.

13. Plaintiff Eldora Quick is an African American female correction officer who has been employed by the DOC since 1990. She has been assigned to RNDC in throughout her career and is presently employed there.

14. Defendant City is a municipality organized and existing under the laws of the State of New York. Under the Charter of the City of New York, the City is responsible for the conduct of DOC, which is the municipal agency responsible for the care, custody and control of persons accused of crimes or convicted and sentenced to one year or less of jail time in the City, and the City's agents, servants and employees who work for DOC. As such the City is responsible for implementing any legal or equitable relief which may be ordered by the Court in this action, including without limitation the injunctive relief requested by Plaintiffs herein.

15. Defendant DOC is an agency of the City. It staffs and administers the city jails and other related institutions charged with the care and maintenance of prisoners incarcerated by and in New York City.

16. Defendant Martin F. Horn has been the Commissioner of the City DOC from January 2003 through the present. He is an employee of the City and is the principal administrator of DOC. He is responsible for the institution and application of DOC's employment policies, work assignment and disciplinary processes. He is also responsible for ensuring that the actions of DOC do not deprive any individual of the

rights secured by the Constitution and laws of the United States as well as the New York Constitution and laws of the State and City of New York. Defendant Horn is the ultimate authority in DOC disciplinary matters, and is and was, at all times relevant to this action, responsible for the hiring, screening, training, retention, supervision, discipline and counseling of the corrections employees under his command. Defendant Horn knew or should have known of the discriminatory customs, practices, policies and wrongful acts of the Defendants described in this Complaint and condoned, ratified and/or authorized such conduct. He is sued in both his individual and official capacities.

17. At all relevant times, Defendant Peter Curcio was the Warden at RNDC. As the Warden at RNDC, Peter Curcio was responsible for supervising correction officers assigned to RNDC, including officers Monche and Quick. Defendant Curcio engaged in the discriminatory customs, practices, and policies described in this Complaint and influenced others to do the same.

18. At all relevant times, Defendant Robert Cripps was a Deputy Warden at RNDC. As a Deputy Warden at RNDC, Robert Cripps was responsible for supervising correction officers assigned to RNDC, Including Officers Monche and Quick. Defendant Cripps engaged in the discriminatory customs, practices, and policies described in this Complaint and influenced others to do the same. Upon information and belief, he has recently been appointed Warden at RISU.

19. At all relevant times, Defendant Deputy Warden Carmine La Bruzzo was a the deputy warden in charge at RISU. As Deputy Warden at RISU, Carmine La Bruzzo was responsible for supervising correction officers assigned to RISU, including Officers Castleberry and Adams. Defendant La Bruzzo engaged in the discriminatory customs, practices, and policies described in this Complaint and influenced others to do the same. Upon information and belief, La Bruzzo has been promoted and currently serves as a warden at a facility other than RISU.

20. At all relevant times, Defendant Jose Matos was a Deputy Warden at RNDC. As a deputy warden, defendant Matos was responsible for supervising correction officers assigned to RNDC including Officer Quick. Defendant Matos engaged in the discriminatory customs, practices and policies described in this Complaint and influenced others to do the same.

21. Beginning in or about December 2004, Raphael Olivo was a Deputy Warden assigned to supervise the Security Department at RNDC, including Officer Monche. Defendant Olivo engaged in the discriminatory customs, practices, and policies described in this Complaint and influenced others to do the same.

22. At all relevant times, Defendant Brenda Emery was assistant Deputy Warden at North Infirmary Command ("NIC"). As an assistant deputy warden at NIC, Brenda Emery was responsible for supervising correction officers assigned to NIC and those assigned to work overtime at NIC. Defendant Emery engaged in the discriminatory customs, practices and policies described in this complaint and influenced others to do the same.

23. At all relevant times, Defendant Matthew Boyd was a Captain at RNDC. As a Captain at RNDC, Boyd was responsible for supervising correction officers assigned to RNDC, including Officer Monche. Defendant Boyd engaged in the discriminatory customs, practices, and policies described in this Complaint and influenced others to do the same.

24. At all relevant times, Defendant Amanda Carmona was a Captain at RISU assigned to the Control Room. She was and is one of two female captains assigned to RISU. As a Captain at RISU, Carmona was responsible for supervising correction officers assigned to RISU, including Officers Castleberry and Adams. Defendant Carmona engaged in the discriminatory customs, practices, and policies described in this Complaint and influenced others to do the same.

25. At all relevant times, defendant Allison Casanova was a Captain at HMD. As a Captain at HMD, Casanova was responsible for supervising correction officers on sick leave. Defendant Casanova engaged in the discriminatory customs, practices and policies described in this Complaint and influenced others to do so.

26. At all relevant times, Defendant Janet Russell was a Captain at HMD. As a Captain at HMD, Russell was responsible for supervising correction officers on sick leave, including Officer Monche. Defendant Russell engaged in the discriminatory customs, practices, and policies described in this Complaint and influenced others to do so.

27. At all relevant times, Defendant Joseph Russo was a Captain at RISU. As a Captain at RISU, Joseph Russo was responsible for supervising correction officers assigned to RISU, including Officers Castleberry and Adams. Defendant Russo engaged in the discriminatory customs, practices, and policies described in this Complaint and influenced others to do the same.

28. At all relevant times, Ralph Rohr was a Correction Officer at RISU who worked with defendant LaBruzzo on scheduling posts and tours for correction officers including Officers Adams, Castleberry and O'Brien. Defendant Rohr engaged in the discriminatory practices and policies described in this complaint and influenced others to do the same. Upon information and belief, defendant Rohr is now retired.

29. At all relevant times, Dr. Faouzia Barouche was a staff psychiatrist employed at the Health Management Division of the DOC ("HMD") As a staff psychiatrist employed at HMD, it is Dr. Barouche's responsibility, inter alia, to determine whether a correction officer is "psychologically fit" for duty. When such a finding is made about a correction officer, it seriously impacts the correction officer's career at DOC. Upon information and belief, Dr. Barouche cooperated with other defendants engaging in the

discriminatory customs, practices and policies described in this complaint and influence others to do the same.

30.    Defendants have at all times acted under color of state law.

## ALLEGATIONS OF FACT

31.    The discriminatory acts with which plaintiffs Adams, Castleberry and O'Brien charge defendants occurred at RISU, among other facilities.  RISU is the unit responsible for the security of the Rikers Island perimeter. No one is allowed onto Rikers Island without passing through RISU.

32.    In addition to the correction officers and supervisors needed to secure the perimeter, RISU is also home to the Canine Unit, the Telecommunication Unit, the Emergency Service Unit, SSD (maintenance), and the Intelligence Unit.  It is also the home of the Emerald Society, a band composed entirely of white Irish males. Because RISU is not a jail and there is essentially no inmate contact, it is regarded as a "preferred command", one in which correction officers prefer to work as compared to others.  Upon information and belief, because RISU is a preferred command, more male correction officers are assigned to RISU than female correction officers. There are 165 officers at RISU, 132 of which are male.  Of the female officers, there are 9 white, 17 are African American and 7 are Hispanic.

33.    The discriminatory acts with which Officers Monche and Quick charge defendants took place at RNDC which houses adolescent detainees.  It is regarded as a difficult facility at which to work in DOC as it is overcrowded and houses some of Rikers' most violent inmates.  Because DOC engages in the pattern and practice of assigning the most unfavorable positions to female rather than male correction officers, there are more female than male correction officers assigned to this facility.  Notwithstanding, the majority of the supervisors at RNDC are male.

34. Certain of the plaintiffs were and continue to be victims of discrimination by HMD, a division of DOC. HMD is charged with supervising the DOC's sick leave policy. When DOC employees are ill and unable to work, they are required to bring a note from their personal doctor describing their illness and setting forth a prognosis. Doctors at HMD then medically examine the employee to determine whether the illness described in the doctor's note is in fact disabling.

35. Personnel at HMD also monitor correction officers on sick leave and are empowered to sanction officers when in their view the policy is not being followed. The decisions made by HMD personnel respecting a correction officer's health and compliance with sick leave procedures can and do impact the positions to which an officer can be posted and her eligibility for promotion. Upon information and belief, DOC supervisors regularly communicate with HMD personnel for the purpose of having HMD arrive at a medical conclusion which facilitates the discriminatory act in which the supervisor is engaging.

## A. Sexual Harassment

36. Defendants have engaged in a pattern and practice of discrimination against female correction officers. Male supervisors sexually harass female correction officers whom they supervise by conditioning the terms and conditions of their employment upon the granting of sexual favors. When such female correction officers refuse to grant sexual favors, male supervisors are permitted to change their assignment or tour to one less desirable than the one they are then holding or otherwise negatively alter the terms and conditions of their employment.

37. When female Correction Officers who have been sexually harassed complain to DOC EEO office, as a matter of pattern and practice, the DOC EEO office either fails to investigate the charges or finds, irrespective of the evidence, that such claims are without merit. Even on those few occasions when DOC finds that there is

merit to a charge of sexual harassment by a female correction officer, it is the pattern and practice of DOC not to punish the harasser.

38. Officer Monche was a victim of sexual harassment by defendant Deputy Warden Raphael Olivo. Officer Monche had a preferred and permanent post as a security escort at RNDC. Beginning with his assignment to RNDC in December 2004, defendant Olivo would often stop by Officer Monche's post at 6:00 am in the morning. He would stroke her arms and touch her earlobes. He told Officer Monche that her arms were sexy and that he wanted to suck her earlobes. He would focus his eyes on Officer Monche's thighs and groin area and make sexual noises. On some occasions, he would press his face against her neck.

39. Whenever Officer Monche needed for some reason to see Olivo in his office, Olivo would take the opportunity to further harass her, making sexual noises and gestures. On one occasion, Olivo pinned Officer Monche against the door, rubbed himself up against her and tried to kiss her on the mouth. Officer Monche repeatedly asked Olivo to let her go but he refused to do so. Officer Monche had to struggle to get free from Olivo's grip.

40. On another occasion when Officer Monche was in Olivo's office, Olivo took off his clothes down to his underwear. He asked for her opinion on his boxer shorts and then put on his uniform. He undressed in front of her another time but that time she was permitted to leave the room.

41. Officer Monche always pushed Olivo away. She showed him pictures of her children and made it clear that she was a happily married woman and had no interest in his sexual attention whatever. Officer Monche found Olivo's relentless sexual pursuit of her degrading, demeaning and disgusting.

42. In May 2005, Officer Monche passed out at work and was assisted out of the facility by the Emergency Medical Service. When she returned to work, Olivo was

joking with staff members that when Officer Monche passed out, her breasts were exposed giving him an opportunity to observe and admire them. He accompanied his description with salacious noises and gestures.

43. Olivo's sexually harassing conduct continued through the summer of 2005 to Officer Monche's vacation in August. Upon information and belief, while she was on vacation, Olivo decided to remove Monche from her preferred post. Upon information and belief, the only reason that Olivo elected to replace Officer Monche as security escort, was because of her refusal to have sex with him.

44. Following her removal from her post, Officer Monche filed a complaint against Olivo with the DOC EEO office. Upon information and belief, many complaints have been filed against Olivo at the DOC EEO office by female correction officers in addition to Officer Monche. Upon information and belief, the DOC EEO office has never found that the complaints against Olivo had any merit. Indeed, Olivo has bragged to women that he has approached for sexual favors that there is no point in complaining about sexual harassment by him because the DOC always finds in this favor.

45. The DOC EEO also found that Officer's Monche's complaint against Olivo for sexual harassment had no merit.

46. Officer Quick was also sexually harassed while working at RNDC.

47. On June 28, 2005 Officer Quick was the administrative sanitation officer responsible for inmates cleaning and sanitizing of the facility. She had a permanent post and tour. While performing her duties, she was informed by telephone that Deputy Warden Matos had ordered her to his office to clean his refrigerator. Officer Quick knocked several times and when Matos opened the door, he was naked to the waist with the zipper on his pants half way down. Matos ordered Officer Quick to come into his office and she refused. She felt humiliated.

48.     Following this incident, Officer Quick reported Matos to her union delegate and the facility EEO officer who helped Officer Quick file a complaint with the DOC EEO office. Upon information and belief, other complaints have been filed against Deputy Warden Matos for sexual harassment. Upon information and belief, Matos has never been sanctioned for such conduct. Though DOC EEO found on this occasion that Officer Quick's claim was meritorious, Matos was not punished.

49.     Following her complaint to DOC EEO about Matos, Officer Quick was removed by Defendants Cripps and Curcio from her permanent post and tour and put on the wheel.

50.     Upon information and belief, female correction officers in addition to officers Monche and Quick have been sexually harassed by their supervisors and had their working conditions negatively impacted when they refused to grant sexual favors to their supervisors.

51.     Upon information and belief, female correction officers who permit their supervisors to sexually harass them are rewarded with improvements in their working conditions, including inter alia, permanent posts and favorable tours, to which they would not otherwise be entitled.

52.     Upon information and belief, while it is possible for female correction officers to succeed at DOC without granting sexual favors to male supervisors and the DOC has many female correction officers who have succeeded on the basis of merit, granting supervisors such favors assures favored treatment. By failing to enforce it rules and regulations against sexual harassment, by failing to properly investigate allegations of sexual harassment, by failing to punish those supervisors who engage in sexual harassment, DOC engages in a pattern and practice which permits and approves demanding sexual favors as a means of advancement and as a means of securing improved working assignments and conditions at the expense of female correction

officers who do not grant sexual favors but are qualified for improved working assignments and conditions.

**B. Hostile Work Environment**

53. Defendants have engaged in a pattern and practice of discrimination against female correction officers of color by, inter alia, maintaining and allowing a work environment that is hostile on the basis of sex and race, including but not limited to degrading radio transmissions, sexist and racist remarks and disparate treatment in the general workplace and in the terms and conditions of employment.

54. At RISU, racially and sexually demeaning phrases are a regular part of the way in which female correction officers of color are addressed on a day to day basis. When women complain that they find such talk offensive, white male officers say they are "just joking," and they continue to make racially and sexually demeaning remarks to and about female correction officers of color.

55. At RNDC, Warden Peter Curcio explained to the African American union delegate for correction officers that "officers need to learn to dance to the beat of their masters." At an open forum for officers, Warden Curcio told the staff to think of him as "their daddy" and Deputy Warden Robert Cripps as their "uncle".

56. Upon the occasion of a visit by the Commissioner of Corrections to RNDC, Curcio treated Officer Monche like a "slave", directing her to serve food to the commissioner.

57. Defendant Matthew Boyd, Monche's white direct supervisor at RNDC regularly made racist remarks to his staff, most of whom were African American or like Officer Monche, Hispanic. Captain Boyd told a correction officer that that if she wanted to keep her job, "she had better kiss his lily white ass." When Boyd told Monche that he no longer wanted her to work at RNDC Security and that he wanted her out of the Command, he sarcastically referred to using the "underground railway" to leave. To a

black inmate, Boyd was heard saying, "You don't want to see what a white boy from Long Island can do to you."

58.    Following a funeral for a black correction officer at which the Emerald Society played, a member of the Emerald Society and another white officer were heard joking that the decedent was buried behind the facility at which he worked as slaves were before the Civil War as though he had no family or people who cared for him.

59.    Plaintiffs have regularly heard male correction officers make comments to the effect that women have no business taking jobs in corrections if they can't handle it and that women shouldn't be allowed to work in preferred posts outside of the jails. Plaintiff Castleberry heard one supervisor laugh and comment, "This isn't a job for women. Their place is being home barefoot and pregnant." Such remarks reflect a bias among supervisors at DOC against people of color and women.

60.    In addition, female officers of color are treated in a demeaning fashion. Orders from supervisors to correction officers are generally transmitted over hand-held radios and can be heard by all employees in a facility carrying a radio and often by inmates. Supervisors regularly shouted orders to Plaintiffs and other female correction officers over these radios, barking their orders in a caustic and demeaning manner, thereby humiliating female correction officers in front of their peers and inmates. Upon information and belief, male correction officers were given orders in a respectful manner.

61.    When female officers are assigned to secure the gates around Rikers, they do not have ready access to toilet facilities. Men typically take bottles to the post to relieve themselves or do so outside but women have to wait for another officer to come and cover their post before they can leave to use the facilities indoors. This is called asking for a "personal".

62.    Requests for relief to go to the bathroom while on duty made by female correction officers have to be made over the radio. Though there is a radio channel that

goes to a limited number of supervisors, in order to get anyone's attention, female correction officers often have to broadcast their need to use the bathroom over the radio channel that is heard everywhere in the facility. Often, their requests are ignored.

63. On one occasion when Officer Castleberry needed a personal, her supervisor, Defendant Joseph Russo, failed to provide her with a relief officer. Defendant Russo only sent relief when Plaintiff Castleberry complained to ADW Pepe. By radio, in a loud and insulting manner, audible throughout the building, Defendant Russo demanded that Plaintiff Castleberry stop by his office when she was through with her personal.

64. On other occasions, when Officers O'Brien and/or Adams asked for a personal, relief was not sent at all and they were compelled to wait until their next break. Having to request permission to go to the bathroom over what is effectively a loud speaker and then to have to wait for whatever period of time it takes supervisors to assign some one to assume their post temporarily is demeaning and embarrassing practice and procedure to which only female correction officers are subjected.

65. Plaintiffs and other female correction officers complained about the hostile work environment to their union representatives and supervisors who in turn brought it to the attention of the respective wardens.

C. Discriminatory Use of the <u>Work Assignment System</u>

<u>Failure to Assign Female Correction Officers to Permanent Posts</u>

66. All correction officers are assigned either to a permanent post in their facility or to a rotating position known as "the wheel". Correction officers on the wheel can be assigned to any post in their facility. New correction officers are initially assigned "to the wheel".

67. Upon information and belief, when a permanent post becomes available,

any correction officer on the wheel can apply for the open post. Deputy wardens recommend correction officers from among those who have applied for the open post to the warden, and the warden makes assignments from among those recommended.

68.     Recommendations for permanent posts are supposed to be based on a correction officer's seniority, attendance, disciplinary and work-performance records. Notwithstanding, the policy and practice of DOC allows for deputy wardens and the warden of a facility to exercise great discretion in assigning permanent posts

69.     Plaintiff Adams was transferred to RISU in 2001. Upon information and belief, at the time Officer Adams transferred to RISU, virtually all white and male officers with the same seniority as Officer Adams had been awarded steady tours and posts. Following Plaintiff Adams's transfer to RISU, Plaintiff Adams was given a steady tour, 2300 X 0731, but not a steady post.

70.     At RISU, Plaintiff Adams applied for a permanent post repeatedly and was refused each time. Vacancies were awarded to men and white officers with less seniority than Officer Adams. Even among officers assigned to the wheel with Adams, white and male officers maintain the same post from week to week, while black and female officers do not; this provides white and male officers the convenience of maintaining a steady post without one actually being awarded.

71.     On one occasion, Officer Adams applied to work security patrol and patrol E. Her request was denied even though she was the officer with the most seniority interested in the post. Rather than award it to Officer Adams, the supervisors kept the post vacant for two years until two men with more seniority than Adams were available to take it. In the interim, the supervisors filled the post with officers on overtime.

72.     Defendant La Bruzzo, acting in concert with defendant Rohr, refused to assign Plaintiff Adams to permanent post, despite her seniority. He consistently assigned her to the least desirable posts at RISU; failed to post vacancies for preferred posts and

then awarded them to white officers with less seniority than Adams; removed other officers from non preferred posts and assigned such posts to Plaintiff Adams's; refused her permission for "mutuals" unless they were with an officer who he wanted to have Plaintiff Adams' post and tour. A "mutual" is an exchange of post and tours between correction officers.

73. On April 26, 2006, Officer Adams was finally assigned a steady post, Post T002 Cash Bail and Gate 9 Security. This is one of the most undesirable posts at RISU. It is outdoors. When not opening or closing the gate, the officer on duty stands in a booth which is infested with bugs and is badly in need of painting. The gates at Gate 9 have to be opened manually. One of the gates has no clearance from the ground and requires lifting and pulling to open and close. The gates are extremely heavy. As a result of opening and closing Gate 9, Officer Adams has bruised her abdominal muscles, causing cramping and vaginal bleeding. Her doctor prescribed pain medication and advised against any lifting that would aggravate her condition.

74. At her doctor's recommendation, Officer Adams requested a transfer from her post to one in which such lifting would not be required. Though she was extremely reluctant to give up the steady post she had waited 5 years to receive, she felt she had no option because her duties had injured her and she could no longer perform them without further risk to her health. Officer Adams has been on the wheel as to both her tour and post since it became too risky to her health to stay on Gate 9.

75. Each of the plaintiff officers, along with other female correction officers waited longer than similarly situated male correction officers to be granted permanent posts and tours. The first steady post that Officer Adams was assigned was in 2000, after she had been with DOC for 10 years. Officer Castleberry was not assigned to a permanent post until she had been with DOC for 11 years. Officer O'Brien was assigned her first permanent post and tour in 2005 after 16 years on the force. Officer Monche did

not receive a permanent post until she had been with the DOC for 14 years. Officer Quick did not receive a permanent post until 2001 after she had been with DOC for 11 years.

76. Upon information and belief, male correction officers and particularly white male correction officers are awarded their first permanent post and tour much sooner in their careers with DOC and are permitted to maintain permanent post and tour assignments far longer than similarly situated female correction officers, particularly those of color.

Failure to Assign Female Correction Officers to Preferred Posts

77. Any post in which a correction officer does not interact with inmates is considered a preferred post. At RISU, any post where a correction officer may work inside is regarded as a preferred post. The non-preferred posts all require correction officers to stand outside and check cars and identifications and bear the weather conditions. Upon information and belief, supervisors at RISU disproportionately assign white male correction officers to preferred posts and female correction officers of color to non-preferred posts.

78. In addition, even when female correction officers of color succeed in being assigned a preferred post, they are removed from such posts more often than male correction officers.

79. Plaintiff O'Brien was assigned a preferred post at NIC prior to her assignment to RISU. However, notwithstanding her assignment, every night the supervisors directed her to serve at a post other than the one she had been awarded.

80. Thereafter, Officer O'Brien became ill. During this period, Officer O'Brien was sick for a period of more than twelve days and was placed in a "category". If an officer is absent for more then twelve days in a calendar year they are considered in a "category". Because Officer O'Brien was in a "category," she lost her preferred post and

was returned to the wheel.

81. Upon information and belief, as a matter of policy and practice, male correction officers, particularly white male correction officers with preferred posts and tours who are in a "category" are not put on the wheel when they return to work while female correction officers, particularly female correction officers of color regularly lose their preferred posts and tours when an illness puts them "in a category."

82. Officer Castleberry was permanently assigned a "preferred" post and tour at RISU, Central Visits tour, 1400X2231, on Wednesdays and Thursdays, and tour 1000X1831 on Friday through Sunday, with Mondays and Tuesdays off. Beginning in the Spring of 2006, Officer Castleberry was removed from her post by Defendant Captain Joseph Russo. Each time that Captain Russo supervised Central Visits, notwithstanding that Castleberry's preferred post was permanent, he reassigned Officer Castleberry to a post outside the building and transferred the male officer originally assigned to the outside post into Officer Castleberry's preferred post.

83. Officer Monche was assigned a preferred post as security escort at RNDC. When Officer Monche refused to grant sexual favors to Deputy Warden Olivo, she was removed from her preferred permanent post and tour and assigned to the wheel. She was ultimately replaced in her security post by Officer Smith, a white male correction officer with 6 months on the job. Upon information and belief, he remains in such post.

84. RISU is a unit which requires that officers assigned there be "gun qualified". Notwithstanding, male correction officers whose gun permit has been revoked continue to work a steady tour and 5X2s, five days on and weekends off, the most coveted assignment, while female correction officers particularly those of color who are gun qualified remain on the wheel.

85. Plaintiffs and other female correction officers complained about

discriminatory work assignments to their peers, their supervisors and to their union representatives, including Union Delegate A. Stokes, who in turn brought them to the attention of wardens of the facilities at which the conduct occurs.

**D. Discriminatory Use of the Disciplinary System: Discipline of Correction Officers at DOC is Meted Out in the First Instance by Supervisors**

86. Upon information and belief, male supervisors use their discretionary powers to discipline female correction officers of color even when they have not committed an infraction of the rules and/or for minor offenses for which they do not discipline male, particularly white, correction officers.

87. Disciplinary action takes three forms. The first and lowest level of discipline is a corrective interview. The second is a supervisor's discipline ("CD") and the third is a memorandum of complaint ("MOC"). The CD is handled at the supervisors' level. The officer is not represented by counsel. The MOC is an administrative proceeding that takes place at the New York City Office of Administrative Trials and Hearings ("OATH"). Here, the officer may be represented by counsel. Generally, only the most serious infractions are subject to a MOC, although many CDs for a particular kind of conduct may lead to a MOC. If a MOC is pending, the officer cannot be transferred or promoted.

88. In July 7, 2006, Captain Joseph Russo filed 5 CDs against Officer Castleberry for various alleged violations of Departmental rules and regulations which, upon information and belief, would not have been filed against male officers engaging in the same conduct. These infractions included but are not limited to charging her with the unauthorized leaving of her post, making false reports and failing to work efficiently when she was delayed in the bathroom for an emergency upon her return from lunch; and charging her with unauthorized leaving of her post, failing to promptly obey orders,

and disrespecting a supervisor when she was 10 yards away from, instead of next to, the security booth at which she was stationed. Indeed, ADW Scott who reviewed these CDs recognized that CDs were too severe a discipline for these kinds of infractions and consolidated and reduced them all to a corrective interview.

89. Nevertheless, as punishment for the corrective interview, Officer Castleberry was removed from her permanent and preferred post and assigned to one that was less desirable. Officer Castleberry elected not to challenge the CDs and agreed to the penalty only because she was assured she would not be assigned to any post which Defendant Russo supervised and because ADW Scott told her she could keep her steady tour. Two weeks later, Plaintiff Castleberry was stripped of her tour as well and assigned to the wheel.

90. Upon information and belief, similarly situated white or male correction officers would not have been have had CD's filed against them or lost their permanent post and tour under such circumstances. Officer Kevin Klune, for instance, a white male correction officer was insubordinate. As punishment, he was permitted to retain his steady tour but not his post. But unlike Castleberry who was told that unless you have a steady tour, you are assigned to the wheel, Klune was not assigned to the wheel. Rather, he was assigned each night to preferred posts during his regular midnight tour.

91. Notwithstanding her seniority, Officer Castleberry continues on the wheel while white and male officers with less seniority are assigned to vacant posts as they arise at RISU.

92. Plaintiff O'Brien has been subjected to similar discriminatory application of the discipline system. In June 2006, Officer O'Brien was transferred to RISU. Unlike white male and female officers, Officer O'Brien was not given any training or orientation respecting the facility when she arrived. Six days after her transfer to RISU, Officer O'Brien and a male correction officer, Officer Tony Cassella, were assigned to Gate 1

and Queens A posts respectively for the midnight tour. The first gate, Queens A, was manned by Officer Casella. At 6:20am, a car passed through Queens A without showing any identification and pulled up to Officer O'Brien at Gate 1. Having watched the car pass Officer Casella's gate without producing identification, Officer O'Brien assumed the driver was a member of service and allowed him to pass without showing identification as well. In fact, the driver turned out to be a civilian who had made the wrong turn onto Rikers Island.

93. At the end of the tour, Officers O'Brien and Casella were required to make reports as to why she had allowed the driver onto the island without showing identification. CDs were filed against Plaintiff O'Brien and Cassella, though Officer O'Brien was never provided with a copy of the CD. As punishment, Officer Cassella lost one vacation day. He was not removed from either his post or tour. Officer O'Brien lost two vacation days and was removed from both her post and tour and assigned to the wheel. In addition, she was transferred out of RISU, a preferred command, to NIC.

94. Recently, CDs were filed against Officer Castleberry by ADW Brenda Emery, an assistant deputy warden at NIC for allegedly defacing posters of Martin Luther King hanging to celebrate Martin Luther King's birthday. As a matter of practice and policy, Emery consistently favors male correction officers over female correction officers. Upon information and belief, at the time the CDs were filed, Emery knew that there was no evidence linking Castleberry to the damage to the posters. Nevertheless, she used the filing of the CDs as a reason for denying Castleberry any further opportunity to do overtime at NIC. Upon information and belief, no similar penalty has been imposed on male correction officers against whom CDs were filed. Castleberry has succeeded in getting the CDs reversed. However, she is still barred from doing overtime at NIC.

95. When ADW Olivo decided to replace Officer Monche in her preferred post with another correction officer, he arranged to have Officer Monche's direct supervisor,

Captain Boyd, file a CD against her alleging violations of 5 DOC regulations which he and Boyd knew she had not violated.

96. In a subsequent meeting with Deputy Warden Robert Cripps, the deputy warden in charge of administration and Warden Peter Curcio, Officer Monche was told that the charges would be dropped if she consented to her transfer from her preferred post to the school area. She agreed to the transfer provided that her 5x2's (weekends off) continued. For Officer Monche, keeping her weekends free was particularly important because she has six children at home and her husband is retired on a physical disability. Upon information and belief the charges were dropped.

97. Nevertheless, following her filing with the DOC EEO, Officer Monche was removed from her permanent tour and assigned to the wheel, losing her free weekends. Further, the aforementioned charges were refiled by Captain Boyd. This time, Boyd told alternative union delegate Taylor to let Monche know that he would drop the charges if she backed off her complaint with the DOC EEO. Officer Monche refused. Though these charges were not pursued, the DOC EEO found that there was no merit to Officer Monche's complaints against Deputy Warden Olivo.

98. Male and particularly white correction officers are infrequently disciplined and when they are disciplined, receive less severe penalties than similarly situated female correction officers of color. Thus, two white male correction officers at RISU, Lucinao Buencamino and Carmelo Sampayo, supervising a work detail left a truck filled with inmates unattended with the motor running. The officers in question were permitted to keep their steady tours and required to surrender their steady posts for just 30 days. Upon information and belief, this serious and dangerous dereliction of duty was not even the subject of a CD.

99. Two white male officers at RISU, Robert Levine and John Barnes, got into a fight. It is the policy at DOC when a captain and a correction officer get into a fight

and/or when there is any discrepancy in their description of an argument, to transfer both to other posts within the facility. One of the officers went to defendant La Bruzzo to complain about being attacked by the other officer. La Bruzzo told him that if he pressed charges, he would have to transfer both of them, but that if he didn't press charges, he, La Bruzzo would treat it like nothing had happened. Neither male correction officer was disciplined or transferred to another post. On the other hand, Castleberry was transferred to another post when there was a dispute between her and Captain Russo.

100. Plaintiffs and other female correction officers complained about discriminatory use of the discipline system to their peers, their supervisors and to their union representative, who in turn brought them to the attention of the wardens.

## E. Discriminatory Dispensation of Other Job Related Terms, Conditions and Benefits

101. According to DOC policy, when there is a vacancy in a post due to illness or other circumstance, the ADW/tour commander fills the post by assigning a correction officer to assume the post as overtime. DOC policy requires that the overtime be assigned in accordance with the number of days a correction officer has served on his/her tour. Thus, overtime is to be assigned first to correction officers listed as "miscellaneous" (that is without assignment) on the personnel assignment sheet; second to correction officers on the last day of their tour; third, to correction officers on the first day of their tour; fourth, to correction officers on the second day of their tour; and fifth, to correction officers on the third day of their tour. The list of priority for overtime is called the "stick list."

102. Notwithstanding the foregoing policy, it is the practice of male tour commanders to order female correction officers who do not want the overtime to assume the vacant post even when there are male correction officers ahead of them on the overtime hours stick list.

103. When there is a post vacancy, it is the practice of male tour commanders to allow "last day" male correction officers to go home and "stick" first day female correction officers with the overtime post.

104. When there is a post vacancy, it is the practice of male tour commanders to allow "last day" male correction officers who want overtime to take the post even if there is a female correction officer who also wants the overtime ahead of him on the "stick" list.

105. When there is a post vacancy in a position that is not preferred, and a male correction officer volunteers for overtime, it is the practice of male tour commanders to remove female correction officers from their assigned posts and order them to take the non-preferred overtime post and put the male correction officer requesting overtime in the post the tour commander has had the female correction officer vacate.

106. Plaintiffs have been subjected to each of these discriminatory practices, among others, in the assignment of overtime during their time at DOC.

107. Plaintiff Monche was compelled to work overtime for "comp time" instead of cash, although white male correction officers were paid cash for their overtime work. Upon information and belief, other female correction officers in addition to Monche were paid "comp time" for overtime instead of cash.

108. Plaintiffs and other female correction officers complained about discriminatory work assignments to their peers, their supervisors and to their union representatives, who in turn brought them to the attention of the respective warden.

**F. Retaliation**

109. Plaintiffs have complained to supervisors, their peers and their union delegate about the sexual harassment, hostile work environment, discriminatory discipline, unfair work assignments, and other discriminatory treatment to which they and

other female correction officers of color were and continue to be subjected and, as stated above, filed charges with the EEOC.

110. The supervisors ignored Plaintiffs' complaints and those of other female correction officers. Instead, Plaintiffs were the target of repeated retaliatory conduct intended to discourage them from pursuing their complaints.

G. Additional Discrimination and Retaliation Against Plaintiff Beatrice Adams

111. On or about August 12, 2005, Plaintiff Adams filed a formal complaint with DOC EEO alleging that RISU, acting through defendants La Bruzzo and Rohr, was discriminating against her on the basis of her race and sex by refusing to assign her to a permanent post, among other things.

112. Upon information and belief, DOC EEO did not conduct a thorough examination of Plaintiff Adams' complaint. The Personnel Captain was not reprimanded for his conduct and the abusive practices were permitted to and did continue. Following her complaint to DOC EEO, Plaintiff Adams continued to apply for permanent posts as they became available. In retaliation for filing a formal complaint, her requests continued to be denied.

113. When in April 2006, defendants finally did assign Officer Adams to a permanent post it was to one of the most undesirable posts at the command, Gate 9 Security. Upon information and belief, Officer Adams was assigned to this highly undesirable post in retaliation for having complained about RISU's discriminatory failure to assign her to a permanent post.

114. Following Officer Adam's decision to relinquish Gate 9 as a permanent post in order to prevent herself from being further injured by having to lift the heavy gate, Officer Adams was returned to the wheel as to not only her post but her permanent tour. Upon information and belief, defendants removed Officer Adams from the permanent

tour in which she had been serving for many years in retaliation for having complained about the Command's discriminatory failure to assign her a permanent post.

115. Officer Adams continued to file requests for the following posts: 536 perimeter patrol and 580 security patrol. These posts did not require the heavy lifting at Gate 9 which had injured her. Both were awarded to male correction officers with less seniority than Plaintiff Adams.

116. She has applied for openings in the following posts: 132 Personnel/ Timekeeper, 131 Personnel Schedule, 504 Cont Building A Post and 130 Personnel and been denied each of them. Upon information and belief, without exception, the posts were awarded to men with less seniority than her.

117. Her supervisors have informed her that she only has two choices, the wheel or the post at Gate 9 where she was injured. When Correction Officers Croom and Brooks recently required an accommodation in their assignments to take injuries into account, they were not required to choose between the wheel and the post in which they had been injured. Rather, their injuries were accommodated. Upon information and belief, the Command's refusal to assign Officer Adams to any permanent post other than Gate 9 at which she was injured is in retaliation for complaining about the Command's discriminatory refusal to assign her to a permanent post.

118. One of the posts to which Plaintiff Adams has been assigned since her return to the wheel is the bail room. In this post, discharged inmates are picking up their personal property following their discharge from the institution. People leave money for bail and money for the inmate use of the facility commissary. Persons leaving money have to be escorted to the cashier which the officer on duty cannot do while she is returning property to departing inmates. The post cannot be safely worked by one officer. Officer Hernandez, a male officer, left the post when he couldn't get help and was assigned to another post. A white female officer, concerned about serving on the

post alone, was transferred to another less dangerous post upon her request. Plaintiff Adams has repeatedly requested assistance when she is assigned the post and no second officer has been assigned.

119. Most recently, Plaintiff Adams has requested transfer out of RISU. So far, that request has not been granted either.

**H. Additional Discrimination and Retaliation Against Plaintiff Nina Castleberry**

120. Plaintiff Castleberry also repeatedly complained about the discriminatory and harassing treatment she was receiving. She filed a complaint against Defendant Russo with DOC EEO in or about May 2006. She filed a 600AR against Defendant Russo on or about July 2, 2006. She filed a complaint against Defendant Russo with the Warden on or about July 6, 2006. On or about July 12, 2006, she filed a grievance against Defendant Russo. So far as Plaintiff Castleberry knows, no action was taken with respect to any of these complaints. Upon information and belief, Russo has not been reprimanded for his conduct.

121. Instead, following her assignment to the wheel, the harassment continued. Plaintiff Castleberry was told by a supervisor that Defendant Carmona had told him that "I am going to get that bitch for Russo."

122. At the beginning of a tour, Defendant Carmona asked Plaintiff Castleberry whether she was responsible for a newspaper that had been left at "A" station. She did not ask the male officer whose post it was. She also did not ask the three male officers she walked by to ask Plaintiff Castleberry whether it was her paper.

123. When Defendant Carmona saw a male officer on duty using his cell phone contrary to DOC rules and regulations, she told him to stand away from the security camera. She did not ask him for a report or write him up as she consistently did Plaintiff Castleberry.

124.    Defendant Carmona requested a report on Plaintiff Castleberry's fingernails which Defendant Carmona claimed were too long. A report is a writing that supervisors ask officers to provide to explain the circumstances under which the officer took the action that the supervisor contends violated DOC rules and regulations. They are placed in an officer's personnel folder and can be the basis for disciplinary action. Plaintiff Castleberry has been repeatedly asked to submit reports under circumstances in which male officers are not required to submit such reports. Subsequently, Defendant Carmona filed a CD against Plaintiff Castleberry for having fingernails that were too long. White female officers are not punished for this sort of conduct.

125.    Defendant Carmona asked Plaintiff Castleberry for a late slip when she was five minutes late for her tour. This is the usual sanction for tardiness. After Plaintiff Castleberry submitted the late slip, Defendant Carmona asked her for a report as to why she was late. Following the report, Defendant Carmona filed a CD against Plaintiff Castleberry for her tardiness. She stated on the CD that Defendant Russo had been a witness to Plaintiff Castleberry's tardiness. In fact, Defendant Russo wasn't even present at the time of the alleged infraction. When Plaintiff Castleberry spoke to ADW Scott about the CD, she told him that Defendant Russo had not been present at the time she arrived late. Scott told her that Defendant Russo had submitted a report stating that he had been, suggesting that both Defendants Carmona and Russo were falsifying documents in order to build up a documentary record of Plaintiff Castleberry's alleged misconduct.

126.    Plaintiff Castleberry has also been asked for reports with respect to failing to salute a chief quickly enough, leaving her post before the arrival of a relieving officer, and for using the restroom leaving the B officer to keep an eye on her post, among others.

127.    On or about November 15, 2006, DOC filed a MOC against Plaintiff

Castleberry for conduct that allegedly occurred on July 29, 2006. The MOC alleges that on July 29, in violation of DOC rules and regulations, Plaintiff Castleberry left her post without permission, failed to request relief or notify the on duty patrol supervisor before she left her post and failed to make any log entries relating to her departure. Plaintiff Castleberry was ordered to submit a report on the circumstances giving rise to these purported violations, which she did. She received a corrective interview respecting her conduct on July 29, 2006 and was subjected to no further penalty. Plaintiff Castleberry intends to contest the charges vigorously. OATH has yet to set a date for the preliminary hearing.

128. Upon information and belief, DOC's filing of an MOC on charges for which Plaintiff Castleberry has already been disciplined, in addition to the other conduct described above, was retaliation for complaining to the DOC about the discriminatory treatment to which she is being subjected.

**I. Additional Discrimination and Retaliation <u>Against Plaintiff Maria Monche</u>**

129. Officer Monche became ill at the end of 2005 and was out on sick leave from that time until her retirement on disability from DOC in or around March 2007. Officer Monche suffers from chronic hypertension which was exacerbated by the tension and stress under which she was working at RNDC.

130. Throughout her illness, which followed the filing of formal charges with DOC EEO, HMD harassed Officer Monche in retaliation for filing complaints with DOC EEO against her supervisors at RNDC. For instance, on April 4, 2006, respondent was examined by Dr. Lowe at HMD. Respondent's blood pressure was found to be abnormally high. Lowe accused her of not taking her blood pressure control medicine and directed her to appear at HMD every day, beginning on April 5, so that Lowe could make sure respondent was taking her medication daily. HMD required this of Officer

Monche knowing that she lived more than an hour away from HMD. Though HMD accused her of feigning her illness, it did not submit a report or recommendation to the commissioner as required by Directive 2262R, Section III H.

131.    HMD staff also engaged in conduct which interfered with Officer Monche's ability to comply with Sick Leave regulations. For instance, Supervisors Captain Allison Casanova and Captain Janet Russell of HMD, on several occasions blocked Officer Monche's ability to log in or out. On April 20, 2006, respondent was unable to log out for a medical appointment with her private physician. Respondent was informed by a staff member at HMD that Captain Russell of the Absence Control Unit had ordered the block. On that same day, Captain Russell made a personal visit. Finding that respondent was at a doctor's appointment without signing out, Captain Russell filed a personal visit form 314 holding respondent in violation of the Department's Sick Leave rules and regulations for failing to sign out for the doctor's appointment.

132.    Continuing their campaign of retaliation against Officer Monche, throughout her illness, HMD changed her appointments at HMD without providing her with notice of the change and when she failed to appear for the appointment declared her AWOL resulting in a loss of a days pay. During 2006 and until her retirement in 2007, Monche was charged with being AWOL not less than seven times resulting in a loss of approximately 17 days' pay.

133.    As further retaliation, HMD required her to see Defendant Faouzia Barouche, who threatened to declare her psychologically unfit, which would result in her "medical separation" or the termination her employment with DOC. Upon information and belief, there was no medical basis for declaring Monche psychologically unfit. Upon information and belief, the threat was made with the knowledge and complicity of Monche's supervisors at RNDC to retaliate against Monche for reporting Deputy Warden Olivo's sexual misconduct and drive her to leave the DOC.

J. **Additional Discrimination and Retaliation Against Plaintiff Tina O'Brien**

134. Following the sanction Plaintiff O'Brien received for allowing an unauthorized person through her posted gate, she filed an appeal regarding the discriminatory difference in penalties which was heard on or about July 6, 2006. Her appeal was denied and two weeks later she was transferred back to NIC. Upon information and belief, Officer O'Brien has been denied a permanent post and tour since her return to NIC in retaliation for complaining about the discriminatory treatment she received at RISU. Male officers with less seniority than Officer O'Brien are assigned steady tours and posts at NIC.

135. The excuse used for transferring Officer O'Brien back to NIC, from which she had requested a transfer due to discriminatory treatment, was that the transfer had been made in error. DOC claimed she should not have been transferred to RISU because she was "in a category" at NIC. Upon information and belief, male officers are transferred from facility to facility while in a category.

136. Upon information and belief, Officer O'Brien was permitted to transfer to RISU because those selecting her assumed that she was white and Irish. When the supervisors at RISU learned that she was African American, they moved quickly to transfer her out of the job and provide a reason for doing so.

K. **Additional Discrimination and Retaliation Against Plaintiff Eldora Quick**

137. Following the filing of her complaint with DOC EEO respecting Deputy Warden Matos' conduct and in retaliation for it, Officer Quick was removed from her permanent post and tour and assigned to the wheel. Defendants have denied repeated applications by Officer Quick for a permanent post and tour, moving her often to undesirable posts while awarding male supervisors with less seniority than she with

permanent posts and tours.

138.   Since her reporting of ADW Matos, Officer Quick has been taunted, verbally abused, joked about and otherwise subjected to a hostile work environment in retaliation for reporting Matos' discriminatory conduct, including but not limited to failing to provide her with a relief officer when she needs to use the bathroom and padlocking her locker. The environment was so pervasively hostile that ultimately Officer Quick became ill, suffering hypertension. In February 2007, she was transported from RNDC to Mount Sinai Hospital by EMS. Following treatment, she was returned to work on a limited duty, restricted basis. When an officer is on restricted duty, there are certain positions to which they are not to be assigned. Typically, these involve inmate contact.

139.   Notwithstanding Officer Quick's restricted status, upon her return to work, she was assigned to Control 2, Main Corridor Security, a high volume post which controls the passage of staff, civilians, visitors and inmates in and out of the facility. When Officer Quick protested that this was not a light duty post, Deputy Warden Griffin demanded that she be reevaluated by HMD. When she arrived at HMD for her reevaluation, the doctor told her that she would be better off retiring and when Officer Quick refused, the doctor threatened to continue her sick rather than return her to limited duty. The result of her being "continued sick" is that she would be placed in a "category" providing the command with an excuse for not assigning her to a permanent post or tour.

140.   In its second evaluation, HMD found Quick fit to return to full duty. Upon information and belief, there was no medical basis for HMD's finding that she was fit to return to full duty. Upon her return to RNDC, notwithstanding her hypertension and her doctor's and HMD's prior evaluation that she should be on restricted duty, she was assigned to Control 2, Main Corridor Security again. Upon information and belief, defendants are continue to harass Officer Quick by rendering her working conditions untenable in retaliation for reporting Matos' misconduct to DOC EEO and the EEOC.

L. Overview

141. The actions of Defendants in depriving Plaintiffs of their statutory, constitutional and civil rights were willful and malicious.

142. At all times herein mentioned, the Defendants City of New York and the DOC have maintained customs, policies and practices which proximately caused and continue to cause and which were likely to lead and continue to lead to the violation of Plaintiffs' and other female DOC employees' statutory, constitutional and civil rights.

143. These customs, polices and practices include, but are not limited to, the following:

a. Condoning and fostering the practice of granting improvements in working conditions for the granting of sexual favors and denying such improvements when sexual favors are not granted;

b. Condoning and fostering a culture of disparaging and harassing treatment of female employees which leads to a hostile work environment for female DOC employees and female employees of color who work in the City's detention facilities;

c. The City's continuing failure to correct, prevent and eliminate discriminatory disciplinary practices and other discriminatory terms and conditions of employment for female DOC employees and female employees of color who work in the City's correctional facilities. This discrimination was known to or should have been known to the Defendants City of New York and DOC and its policy-making leaders at all times mentioned herein;

d. A custom, pattern and practice of retaliating against the Plaintiffs and other female employees and female employees of color who complain of discrimination within the DOC and the City's continuing failure to correct, prevent and eliminate such retaliation.

e. The continuing refusal and/or failure on the part of the Defendants City of New York and DOC, and its policy-making leaders, to fully and adequately discipline supervisory officers who use their discretionary authority in a discriminatory fashion.

144. Plaintiffs and other female correction officers and female correction officers of color have suffered and will continue to suffer irreparable injury caused by

Defendants' unlawful acts including interference with their civil rights, their right to speak out against discrimination, and their right to be free of employment discrimination based upon sex and race.

145. As a direct and proximate result of Defendants' unlawful acts, Plaintiffs, other female correction officers and other female correction officers of color have suffered and continue to suffer loss of income, loss of overtime income, loss of opportunity for career advancement, promotion and other employment benefits, and have suffered and continue to suffer pain and suffering, emotional distress, humiliation, embarrassment, and damage to their careers and reputations.

146. As a result of Defendants' acts, Plaintiffs are entitled to compensatory damages and punitive damages in amounts to be determined at trial.

**FIRST CLAIM FOR RELIEF**
**(HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII)**

147. Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully set forth therein.

148. Defendants' acts described above of granting improvements in working conditions to female correction officers and female corrections officers of color who agree to provide sexual favors to their supervisors and denying them to female correction officers and female correction officers of color who refuse to grant such favors, constitute sexual harassment.

149. Such sexual harassment constitutes discrimination in employment on the basis of sex, gender and race in violation of 42. U.S.C.§§20002 et.seq.

150. As a result of Defendants' act, Plaintiffs, other female correction officers and other female correction officers of color have been damaged.

## SECOND CLAIM FOR RELIEF
## (HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII)

151. Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully set forth herein.

152. Defendants' acts described above constitute a persistent and pervasive pattern and practice of degrading and harassing conduct based on Plaintiffs' gender and race, which has created a hostile work environment for Plaintiffs, other female employees and other female employees of color.

153. Defendants' creation of a hostile work environment constitutes unlawful discrimination in employment on the basis of sex/gender and race in violation of 42 U.S.C. §§ 2000e et seq.

154. As a result of Defendants' acts, Plaintiffs, other female DOC employees and other female employees of color have been damaged.

## THIRD CLAIM FOR RELIEF
## (DISCRIMINATORY TREATMENT IN VIOLATION OF TITLE VII)

155. Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully set forth herein.

156. As described above, Defendants have discriminated against Plaintiffs, and similarly situated DOC employees in connection with disciplinary and work assignment practices and other terms and conditions of employment of DOC.

157. Defendants' discrimination against Plaintiffs with regard to discipline and work assignments constitutes unlawful discrimination in employment on the basis of gender and race in violation of 42 U.S.C. §§ 2000e et seq.

158. As a result of Defendants' acts, Plaintiffs, other female DOC employees and other female employees of color have been damaged.

**FOURTH CLAIM FOR RELIEF**
**(UNLAWFUL RETALIATION IN VIOLATION OF TITLE VII)**

159. Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully set forth herein.

160. Defendants have retaliated against Plaintiffs for their opposition to unlawful employment practices and complaints of discrimination within DOC.

161. Defendants' retaliatory acts, including, inter alia, discriminatory disciplinary treatment, violates 42 U.S.C. § 2000e-3(a) which makes it unlawful for an employer to retaliate against its employees for opposing unlawful employment practices or filing complaints of discrimination.

162. As a result of Defendants' acts, Plaintiffs, other female DOC employees and other female employees of color have been damaged.

**FIFTH CLAIM FOR RELIEF**
**(VIOLATION OF 42 U.S.C. § 1983)**

163. Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully set forth herein.

164. Defendants have engaged in a pattern and practice of discriminating against female correction officers and female correction officers of color by, inter alia, maintaining and allowing a hostile work environment, subjecting female officers and female correction officers of color to disparate treatment including but not limited to discrimination in connection with discipline and work assignments, the imposition of disciplinary penalties and retaliation against female correction officers and female correction officers of color opposing and/or complaining of discrimination suffered by themselves or others.

165. Defendants have, by the actions described herein, acted under color of state law to discriminate against Plaintiffs on the basis of sex and race, thereby abridging

the privileges and immunities secured to Plaintiffs by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and laws of the United States and the State of New York, in direct violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

166. As a result of Defendants' acts, Plaintiffs, other female DOC employees and other female employees of color have been damaged.

## SIXTH CLAIM FOR RELIEF (VIOLATION OF NYSHR LAW)

167. Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully set forth herein.

168. This claim is brought pursuant to the supplemental jurisdiction of this Court, under NYSHRL, Executive Law §§ 290 et seq.

169. Defendants' policies, practices and actions described above have created a hostile working environment for female DOC employees and female employees of color, in violation of the NYSHRL, Executive Law §§ 290 et seq.

170. Defendants' policies, practice and acts described above constitute unlawful discrimination in the terms and conditions of employment on the basis of sex and race, in violation of the NYSHRL, Executive Law §§ 290 et seq.

171. As a result of Defendants' acts, Plaintiffs, other female DOC employees and other female employees of color have been damaged.

## SEVENTH CLAIM FOR RELIEF (RETALIATION IN VIOLATION OF NYSHRL)

172. Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

173. This claim is brought pursuant to the supplemental jurisdiction of this Court, under NYSHRL, Executive Law § 296.

174. As a result of Plaintiffs' opposition to Defendants' discriminatory policies, practices and actions and Plaintiffs' complaints, Plaintiffs have been subjected by Defendants to retaliation including but not limited to disciplinary action.

175. Defendants' retaliatory actions against Plaintiffs constitute a violation of NYSHRL, Executive Law § 296.

176. As a result of Defendants' acts, Plaintiffs, other female DOC employees and other female employees of color have been damaged.

**EIGHTH CLAIM FOR RELIEF**
**(VIOLATION OF NYCHRL)**

177. Plaintiffs repeat and re-allege each and every allegation contained above with the same force and effect as if fully set forth herein.

178. This claim is brought pursuant to the supplemental jurisdiction of this Court, under the New York City Human Rights Law.

179. Defendants' policies, practices and actions described above have created a hostile working environment for female DOC employees and female employees of color in violation of the NYCHRL, § 8-107 et seq.

180. Defendants' policies, practice and acts described above constitute unlawful discrimination in the terms and conditions of employment on the basis of sex and race, in violation of the NYCHRL, § 8-107 et seq. Defendant City of New York, an employer subject to the New York City Human Rights Law, has unlawfully discriminated against Plaintiffs, other female DOC employees and other female employees of color because of their sex and race in the terms, conditions, and privileges of employment, has created a hostile work environment based on sex and otherwise taken adverse action against Plaintiffs, other female DOC employees and other female employees of color in violation of New York City Local Law 59 of 1986 as amended by Local Rule 39 of 1991, New York City Administrative Code § 8-107 et seq.

181. Plaintiffs will timely serve a copy of this complaint upon the New York City Commission of Human Rights and the New York City Corporation Counsel.

182. As a result of Defendants' acts, Plaintiffs, other female DOC employees and other female employees of color have been damaged.

**NINTH CLAIM FOR RELIEF**
**(RETALIATION IN VIOLATION OF NYCHRL)**

183. Plaintiffs repeat and re-allege each and every allegation contained above with the same force and effect as if fully set forth herein.

184. This claim is brought pursuant to the supplemental jurisdiction of this Court, under NYCHRL, New York City Administrative Code § 8 - 107(7).

185. As a result of Plaintiffs' opposition to Defendants' discriminatory policies, practices and actions and Plaintiffs' complaints, Plaintiffs have been subjected by Defendants to retaliation including but not limited to disciplinary action. Defendants' retaliatory actions against Plaintiffs constitute a violation of NYCHRL, New York City Administrative Code § 8 - 107(7).

186. As a result of Defendants' acts, Plaintiffs, other female DOC employees and other female employees of color have been damaged.

**TENTH CLAIM FOR RELIEF**
**(AIDING AND ABETTING LIABILITY AGAINST INDIVIDUAL DEFENDANTS)**

187. Plaintiffs repeat and re-allege each and every allegation set forth above with the same force and effect as if fully set forth herein.

188. Pursuant to NYSHRL, Executive Law §296(6) and NYCHRL, NYC Administrative Code § 8-107(6) the individual Defendants are individually liable for the acts of discrimination and retaliation described above.

189. As a result of Defendants' acts, Plaintiffs, other female DOC employees

and other female employees of color have been damaged, and are entitled to both compensatory and punitive damages against the individual defendants.

## RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court

190. Enter judgment declaring that the acts and practices of Defendants described above are in violation of the laws of the United States and New York;

191. Issue a permanent injunction:

(a) Requiring Defendants to eliminate discrimination on the basis of sex and race within and among their departments;

(b) Requiring Defendants to treat female correction officers and female correction officers of color identically to white male correction officers in all respects including, but not limited to, work environment, terms and conditions of employment, and disciplinary process and work assignments;

(c) Requiring Defendants to refrain from retaliating against Plaintiffs or any other employees for making complaints about discriminatory treatment and conduct by Defendants; and

(d) Ordering that Defendants immediately rescind and expunge any and all records of discipline issued to Plaintiffs from any and all files and records of the DOC;

192. Grant such additional equitable relief as is proper and just, including but not limited to, requiring Defendants to (a) address and eliminate the culture of disparaging and harassing female employees and female employees of color who work in the City's correction facilities; (b) enter into a plan to eliminate the hostile work environment at DOC to be administered under supervision of the Court or other appropriate monitor; and (c) take appropriate disciplinary action against Defendants for their discriminatory actions;

193. Order that Defendants immediately reimburse, and make whole Plaintiffs for any and all benefits to which they would have been entitled had it not been for Defendants' illegal actions including, but not limited to back pay and lost overtime with

interest, benefits, and seniority from the time of Defendants' illegal actions taken against them;

194. Award compensatory damages for the pain, suffering, emotional distress, loss of dignity, humiliation, and damages to reputation and livelihood endured by Plaintiffs in amounts that are fair, just and reasonable, to be determined at trial;

195. Award Plaintiffs punitive damages in an amount to be determined at trial;

196. Award Plaintiffs all costs of this action and reasonable attorneys' fees, as provided for in 42 USC § 1988 and 42 USC § 2000e-5(k); and NYC Administrative Code 8-10.

197. Grant Plaintiffs such other and further relief as the Court deems appropriate and equitable, including injunctive and declaratory relief as may be required in the interest of justice.

**JURY DEMAND**
**PLAINTIFFS DEMAND TRIAL BY JURY**

Dated: New York, New York
June 8, 2007

EGAN LAW FIRM

By________________________

Susan B. Egan (SE 2564)
Attorneys for Plaintiffs
112 Madison Avenue
3rd Floor
New York, NY 10016