UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
BEATRICE ADAMS, NINA CASTLEBERRY,
MARIA MONCHE, TINA O'BRIEN, and
ELDORA QUICK,

                        Plaintiffs,

      -against-

THE CITY OF NEW YORK,

                      Defendant.
---------------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 07-CV-2325 (FB)(RER)

*Appearances*:
*For the Plaintiff*:
SUSAN B. EGAN, ESQ.
Attorney for Plaintiffs
122 Madison Avenue, Third Floor
New York, NY 10016

*For the Defendant*:
PHYLLIS GAIL CASTRO, ESQ.
Senior Assistant Corporation Counsel
100 Church Street, Room 2-112
New York, NY 10007

**BLOCK, Senior District Judge:**

        Plaintiffs Beatrice Adams, Nina Castleberry, Maria Monche, Tina O'Brien and

Eldora Quick are current and former correction officers with the New York City Department

of Corrections ("DOC"). They allege that during their employment with DOC, they suffered

race and gender discrimination, a hostile work environment due to this alleged

mistreatment, and retaliation for their complaints. They bring claims under Title VII of the

Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"),

the New York City Human Rights Law ("NYCHRL") and 42 U.S.C. § 1983 ("§ 1983").

Defendant, the City of New York ("the City")[1] moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, its motion is granted in part and denied in part.

## I

The following facts, which are taken from the parties' Rule 56.1 statements and supporting documentation, are undisputed unless otherwise noted. Where disputed, they are presented in the light most favorable to the plaintiffs. *See, e.g,. Federal Ins. Co. v. American Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

Plaintiffs Adams, Castleberry, O'Brien and Quick are female, African-American current uniformed members of DOC. Plaintiff Monche is a female, Hispanic former uniformed member of DOC who left her job on psychological disability retirement in 2007. All served as correction officers ("COs") during the period relevant to this lawsuit. Adams, Castleberry and O'Brien were assigned to Rikers Island Security Unit ("RISU"). Monche and Quick were assigned to the Robert N. Davoren Center ("RNDC"), an adolescent detention facility on Rikers Island. The alleged instances of discrimination occurred between approximately 2001 and 2007.

COs at RISU and RNDC are assigned to "posts"; their duties vary according to the locations of the posts. More senior COs are assigned to "permanent" posts. COs without permanent posts are said to be on the "wheel," a rotating position where they may

---

[1] Plaintiffs also sued DOC and 14 individuals. Because DOC is a non-suable agency of the City, it must be dismissed as a defendant. *See, Echevarria v. Department of Corr. Servs.*, 48 F.Supp.2d 388, 391 (S.D.N.Y. 1999). The individual defendants were dismissed by stipulation of the parties. The caption is deemed amended accordingly.

be assigned to different posts on a daily basis. In addition to seniority, assignment to permanent posts is based upon attendance, disciplinary record, and work performance.

Plaintiffs describe assignment to a permanent post as a "benefit" that is "supposed to be accorded to them by virtue of their seniority and their performance records" because the wheel is "an assignment that results in the officer not knowing from day to day either the post or the tour upon which she will be serving." Pl's Mem. of Law at 3. Plaintiffs state that the wheel makes it "impossible to arrange one's life outside of work" and that the wheel "is even more difficult for women because it leaves supervisors free to assign them to posts where there are no bathroom facilities." Pl's Mem. of Law at 23. Adams states in her affidavit opposing defendant's motion for summary judgment that on the wheel "the tour commander is free to assign [COs] to whatever post is vacant," including particularly demanding or uncomfortable posts. Adams Aff. ¶¶ 9, 11. Castleberry stated in her affidavit that "[h]aving a steady post and tour is much better than being on the wheel because it makes it impossible to manage the rest of your life. On the wheel, you do not know from one day to the next whether or where you are going to be working." Castleberry Aff. ¶ 4. Plaintiffs do not present additional details on how the wheel operated or what negative consequences followed assignment to the wheel.

## A. Adams's Experience

Between 2004 and August 2005,[2] Adams wrote several memoranda complaining about the conduct of her supervisors and filed a grievance with the Correction

_____

[2] The record does not contain specific dates.

Officers Benevolent Association ("COBA"). She complained that acting Warden Carmine LaBruzzo, a white male, assigned her to "the really miserable posts" while she was on the wheel. Adams Aff. ¶¶ 10, 11, 16. On August 12, 2005, Adams filed a complaint with the DOC Office of Equal Employment Opportunity ("EEO") alleging discrimination by her white male superiors because she had not received a permanent post.

Adams requested and was offered a permanent post in late 2005. However, she did not accept the post because it was a midnight shift. Adams applied for a permanent post again in 2006. She was offered a post, which she accepted, on April 26, 2006. That post was outside and required her to frequently lift and open a heavy gate. She developed an abdominal injury, and upon the advice of her doctor she requested a transfer in June 2006. In her affidavit, Adams states that LaBruzzo gave her two options: remain at her post or return to the wheel. In October 2006, she forfeited her post and returned to the wheel.

## B. Castleberry's Experience

Castleberry was assigned to RISU in 2001 and received a permanent post immediately upon her arrival. On June 12, 2006, Castleberry filed a complaint with the EEO about discriminatory treatment by her white male supervisor, Captain Joseph Russo. She complained that Russo wrote her up frequently because she was a black woman and removed her from her permanent post in favor of a white male CO. On July 2, 2006 Castleberry filed a memorandum with the warden describing the same allegedly harassing conduct mentioned in her EEO complaint.

On July 17, 2006, Castleberry received five disciplinary citations from Russo for departing from her post, making false reports, failing to obey orders, disrespecting a

supervisor and failing to work efficiently. These citations were reduced to a less serious disciplinary level known as a "corrective interview." As a penalty following her corrective interview, Castleberry forfeited her permanent post and returned to the wheel on August 12, 2006. Castleberry said in her affidavit that "corrective interviews usually do not result in the imposition of penalties," and "losing your tour and post as a consequence of a corrective interview is really an extraordinary punishment." Castleberry Aff. ¶¶ 42, 43.

## C. Monche's Experience

Monche worked at a permanent post from 2004 through 2005. In December 2004 Monche's supervisor, Deputy Warden Raphael Olivo, gave Monche a gift basket containing skin lotions. For the approximately eight months that followed, according to plaintiffs, Olivo visited Monche's post almost "every morning" to inquire about putting the lotions on her. Pl's Mem. of Law at 13. He would touch her, make sexual remarks, "pin her to the wall and try to kiss her," and "hold her and refuse to let go of her." Pl's Mem. of Law at 14. Plaintiffs also refer to two occasions when Olivo undressed in front of Monche: he once removed his clothing and asked her opinion on his boxers; and in August 2005 Olivo made Monche sit in his lap, tried to kiss her, and removed his pants. On October 5, 2005, Monche filed a claim against Olivo with the EEO, claiming that Olivo sexually harassed her. The EEO found that the complaint was unsubstantiated because it lacked corroboration.

In September 2005, Monche's white male supervisor, Captain Matthew Boyd, filed disciplinary charges against her, claiming she failed to submit a report to him on time and that her report contained inadequate information. In exchange for the dismissal of those charges, she forfeited her permanent post. In her affidavit, Monche states that two white

male supervisors, Warden Peter Curcio and Deputy Warden Robert Cripps, promised that after leaving that permanent post she would be assigned to a different permanent post, keeping her previous schedule, instead of being returned to the wheel.  She did briefly receive such a post, but on October 6, 2005, Curcio and Cripps returned her to the wheel.

Monche alleges that Curcio and Cripps told her that she lost her new post because certain RNDC posts, including hers, were not awarded in compliance with DOC regulations, and therefore needed to be reposted.  On October 18, 2005 Monche filed a complaint with the EEO against Cripps and Curcio, claiming that she was returned to the wheel in retaliation for her complaint against Olivo.  She filed another complaint with the EEO, claiming retaliation for her prior EEO complaints, on November 11, 2005.

**D. O'Brien's Experience**

Before transferring to RISU in 2006, O'Brien worked at a permanent post at the North Infirmary Command ("NIC") beginning in 2005.  Her white male supervisor required her to take sick inmates on hospital runs, while male officers remained at the facility "in case there was a problem."  O'Brien Aff. ¶ 7.  After being out sick for more than 12 days in one year, O'Brien received the disfavorable label "chronic sick" on March 24, 2006.  As a result, she lost her permanent post and returned to the wheel at NIC.  Her appeal of the "chronic sick" designation was denied.  She then applied for and was granted a transfer to RISU, where she was placed on the wheel.

On June 23, 2006, her sixth day at RISU, O'Brien and a white male CO permitted an unauthorized civilian to pass through their gate post without presenting identification.  O'Brien lost two vacation days and was involuntarily sent back to NIC.  Her

appeal of this punishment was denied. The male officer lost two days of "comp time," personal days acquired by working through lunch, and was suspended from his post. The City accounted for the difference between the male CO's punishment and O'Brien's by stating that, because of her "chronic sick" categorization, O'Brien should never have been transferred to RISU in the first place. On September 6, 2006, O'Brien filed a complaint with the Equal Employment Opportunity Commission ("EEOC") claiming that she received a harsher punishment than the male officer.

**E. Quick's Experience**

Quick was assigned to a permanent post in 2001. On June 28, 2005 Deputy Warden Matos summoned Quick along with a group of inmates to his office. Quick states in her affidavit that "[w]hen Matos opened the door, he was naked to the waist and the zipper of his pants was down.[3] Matos insisted that I come into the office but I refused until he put on his shirt and zipped up his pants." Quick Aff. ¶ 7. The group entered the office when Matos put on a shirt, and "Matos directed [Quick] to lock the door until he got completely dressed and [she] refused again . . . [Quick] felt disrespected, disgusted, offended and humiliated by Matos'[s] actions." Quick Aff. ¶ 8. Quick filed an EEO complaint against Matos on June 28, 2005. The EEO substantiated her claim because the inmates who were with Quick at Matos's office corroborated her story, but Matos received no punishment. Matos retired shortly after this incident.

On October 4, 2005, Cripps and Curcio removed Quick from her post and returned her to the wheel. They told Quick that her post must be reposted because it was

---

[3]The record does not contain evidence on what, if anything, was exposed by the lowered zipper.

awarded in a manner inconsistent with the DOC directive on assignment of posts. On October 13, 2005, Quick filed a complaint with the EEO against Curcio and Cripps, for retaliation. In February 2006, Quick was informed that her complaint did not "fall under the purview of the EEO office," and so she filed a complaint with the federal EEOC. Quick Aff. ¶ 37.

While on the wheel, Quick was frequently out sick. In late 2005, due to concerns that her high-stress post exacerbated her high blood pressure, Quick requested and received a transfer to the "Academy."[4] In mid-2006, Quick was involuntarily returned to RNDC. Her applications for permanent posts at RNDC during 2006 and 2007 were all denied. Her request for a transfer from RNDC to Elmhurst Hospital Ward, where she was on the wheel, was granted in October 2007. Also in October 2007, Quick was categorized as "chronic sick" because she took more than 12 sick days in the previous year.

## F. General Allegations of Racist and Sexist Environment

Plaintiffs provide evidence which they believe tends to enhance their account that they suffered a hostile, or at least suboptimal, work environment at RISU and RNDC. For example, in October 2005 Cripps and Curcio announced at roll call that COs should refer to them as "daddy" and "uncle" and should "dance to the drum beat of their masters." In November 2004, Boyd told a black female CO that she should "kiss his lily white ass" and told a black inmate that "you don't want to see what a white boy from Long Island can do to you." Boyd also "reduced Monche to tears one day at roll call by screaming at her derisively." Plaintiffs allege that it is commonplace for supervisors to berate female COs in

---

[4]The record does not define the "Academy."

a demeaning fashion in front of their peers. At the funeral of a black CO, white officers joked about burying the CO "the way slaves were" buried. A white male supervisor said that women belong "at home barefoot and pregnant."[5] Pl's Mem. of Law at 7-8.

Plaintiffs also note that certain posts at Rikers Island do not have toilets readily accessible. COs at those posts must radio for another officer to temporarily take over their post before taking a break to use the bathroom. Although the City claims that the wait varied "from no wait to ten to fifteen minutes," plaintiffs claim that female officers typically waited an uncomfortably long time for a bathroom break. Def's 56.1 Stmt ¶ 18; Pl's 56.1 Stmt ¶ 18. Adams stated in her deposition that the delay in sending a CO to cover your post depends upon "if the relieving officer likes you." Ex. B, Adams Tr. 44:5-8. Certain (primarily male) officers at these posts urinate into bottles rather than requesting a bathroom break, and plaintiffs claim that posts were often littered with bottles of urine. Plaintiffs contend that the Rikers bathroom policy disproportionately affected female COs because it is easier for men to urinate without the privacy of a bathroom, for example by urinating into bottles, than it is for women. Adams states in her affidavit that in early 2008, her supervisor delayed sending a relieving officer so that she could take a bathroom break. Because Adams had a medical condition and could not wait she left her post before a CO arrived, but still did not make it to the bathroom before she urinated on herself. Adams Aff. ¶ 48. Castleberry states in her affidavit that on one occasion in July 2006 she waited 40 minutes before being permitted to use the bathroom. Castleberry Aff. ¶ 29. Quick states in her affidavit that

---

[5]The record does not contain specific dates when Boyd screamed at Monche, the funeral comment or the "barefoot and pregnant" comment, although plaintiffs claim that these episodes occurred during the time period relevant to this lawsuit.

throughout 2005 her supervisor would frequently refuse to give her bathroom breaks, claiming that there were no officers available to relieve her.  Quick Aff. ¶ 30.

**II**

All five plaintiffs base their discrimination claims on their assignment either to the wheel or to undesirable permanent posts other than those they requested.  All of the plaintiffs were at some point assigned to the wheel.  Several of the plaintiffs–Monche, Castleberry and O'Brien–claim that they were coerced into forfeiting their permanent posts after they received unfairly applied disciplinary charges.  Adams and O'Brien claim that, even when they were assigned to permanent posts, they received very bad post assignments: Adams worked at a physically challenging outdoor gate, while O'Brien received "hospital run" duty requiring long hours and exposure to sick inmates.

**A. Standards Governing Discrimination Claims**

Plaintiffs' Title VII and NYSHRL discrimination claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The Second Circuit describes this framework as follows:

> [T]he plaintiff bears the initial burden of establishing a prima facie case of discrimination . . . . If the plaintiff does so, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action . . . . If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination.

*Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008) (citations and internal quotation marks omitted).

To state a prima facie case of employment-related discrimination, a plaintiff must show (1) membership in a protected class; (2) that she was qualified for her positions; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See, e.g., Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). It is undisputed that plaintiffs, as non-white females, are members of a protected class. It is also undisputed that plaintiffs were qualified for their positions. The validity of plaintiffs' claims therefore turns on the third and fourth elements.

To qualify as an adverse employment action, the action complained of must be "materially adverse." *Id.* "To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabaya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.*

With respect to discriminatory intent, "[a] showing of disparate treatment–that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group–is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks omitted). A plaintiff invoking this theory must show that she received inferior treatment compared to peers that were

"similarly situated in all respects." *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).

**B. Analysis**

It is undisputed that assignment to the wheel is inconvenient because the rotating system is unpredictable. However, "[i]nconvenience by itself . . . does not constitute an adverse job action." *Johnson v. Eastchester Union Free School Dist.*, 211 F. Supp. 2d 514, 518 (S.D.N.Y. 2002) ("Apart from asserting the inconvenience of the change in location and hours, plaintiff has failed to adduce any evidence that those changes constituted a demotion."). Plaintiffs further fail to create a material issue of fact that transfers to the wheel or to undesirable permanent posts resulted "in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Galabaya*, 202 F.3d at 640 (No adverse employment action where a teacher transferred to an undisputedly "inferior" school where teachers rotated rather than having permanent classrooms, and where he taught mainstream courses rather than special education).

Plaintiffs cite cases holding that unfavorable post assignments constituted a materially adverse employment action. In *Fullard v. City of N.Y.*, a CO was denied a post that "would have matched his education and training and thus would have maximized his chances for success and advancement." 274 F.Supp.2d 347, 355 (S.D.N.Y. 2003). In *Monclova v. City of N.Y.*, COs were transferred to physically dangerous post with a high risk of violent incidents with inmates. No. CV-05-3164, 2008 WL 822117, at *7 (E.D.N.Y. 2008). At oral argument, plaintiffs relied upon *Meckenberg v. New York City Off-Track Betting*, in which working conditions at the plaintiff's position were "objectively unfavorable due to the shortage in staff." 42 F.Supp. 2d 359, 377 (S.D.N.Y. 1999). None of these cases apply here

because plaintiffs' evidence does not demonstrate similar negative consequences. Plaintiffs' only evidence of the adversity of the wheel shows that COs could be assigned to any post on a given day; they do not offer evidence that the type of work performed at varying posts while on the wheel is materially different from work performed on a permanent post, or that posts on the wheel are otherwise inferior to permanent posts. Plaintiffs evince their own dissatisfaction with their posts, but "subjective, personal disappointment is not enough." *Breyer v. County of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008) (internal quotations marks omitted); *Meckenberg*, 42 F.Supp. 2d at 378. Consequently, plaintiffs show that they experienced a mere inconvenience, rather than a materially adverse employment action.

Because the assignment of plaintiffs to the wheel or undesired permanent posts is not an adverse employment action, the Court need not address discriminatory intent. Although the alleged racist and sexist comments of white male supervisors could very well give rise to an inference of discriminatory intent, plaintiffs do not connect that conduct to any adverse employment action. Those allegations are better analyzed under a hostile work environment theory.

Accordingly, summary judgment is granted with respect to the employment-related discrimination claims of all five plaintiffs.

### III

All five plaintiffs claim that they suffered discriminatory retaliation, primarily removal from their permanent posts and placement on the wheel, after filing complaints with the EEO. Plaintiffs' retaliation claims, unlike their employment-discrimination claims, rely upon widely varying facts. As a result, the Court will analyze their retaliation claims

individually.

## A. Standards Governing Retaliation Claims

Plaintiffs' retaliation claims, like their employment-discrimination claims, are analyzed under the burden-shifting framework of *McDonnell Douglas*, 411 U.S. 792 (1973).

To establish a prima facie case of retaliation, a plaintiff must show (1) that she participated in a protected activity, (2) that this activity was known to her employer, (3) that she suffered an adverse employment action, and (4) the existence of a causal connection between the protected activity and the adverse employment action. *See Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006).

There is no dispute that plaintiffs engaged in an obviously protected activity when they filed complaints with the EEO.[6] As a result, their retaliation claims hinge on the third and fourth elements.

The definition of the third element, "adverse employment action," is more relaxed for claims of retaliation than for claims of employment discrimination. To show an adverse employment action in the retaliation context, a plaintiff must demonstrate that the challenged action was "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks v. Baines*, 593 F.3d 159, 162 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006)).

---

[6] The City contends that plaintiffs do not establish knowledge on the part of any individual who allegedly retaliated against them. Def's Mem. of Law at 11. The Court finds that the second element is not at issue, however, because it is undisputed that DOC as a legal entity possessed knowledge. "[T]o satisfy the knowledge requirement, [nothing] more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000).

Unlawful retaliation is therefore not limited to "actions that affect the terms and conditions of employment." *Id.* The fourth element– a causal connection between the protected activity and adverse employment action– may be illustrated either "indirectly, by showing that the protected activity was followed closely by discriminatory treatment," or "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Id.* at 170 (internal quotation marks omitted). Circuit precedent does not draw "a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." *See Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554-55 (2d Cir. 2001) (citing cases).

**B. Analysis– Adverse Employment Action**

All five plaintiffs claim that they were denied permanent posts and placed on the wheel as retaliation for submitting complaints to the EEO. Although the standard used is objective, "context matters" so that determining the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships." *White*, 548 U.S. at 69. "[A]n act that would be immaterial in some situations is material in others." *Id.* Plaintiffs submit substantial evidence showing that the wheel was widely considered, by all COs, a less desirable post, and that they preferred permanent posts where they kept regular hours and consistent location assignments. It is irrelevant for the purposes of the retaliation claims– unlike discrimination claims– that the wheel did not entail a change in the terms and conditions of their employment. *See Hicks*, 593 F.2d at 170 (holding that threat of discipline and/or assignment to a different work schedule qualified as adverse employment actions).

15

Although, as discussed above, assignment via the wheel is not sufficiently adverse to sustain a discrimination claim, the threat of being relegated to an allegedly inferior stratum of work assignments could well dissuade a reasonable worker from taking advantage of the dispute resolution processes afforded by the EEO. Accordingly, all five plaintiffs satisfy the adverse employment action element of their retaliation claims.

## C. Analysis-Adams's Retaliation Claim

Adams claims that, after she filed her August 2005 EEO complaint about her supervisors' failure to assign her to a permanent post, her supervisor assigned her to an undesirable permanent post at a heavy outdoor gate in April 2006. In June 2006, the supervisor denied her a transfer from that physically demanding permanent post and threatened her with return to the wheel. Adams returned to the wheel slightly over one year after her EEO complaint, in October 2006.

Adams's transfer to an uncomfortable permanent post, the first of several actions that she claims were retaliatory against her, occurred approximately eight months after she engaged in protected activity by filing her EEO complaint. This is sufficiently proximate to satisfy the causation element of Adams's prima facie case. *See Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (holding that a delay of eight months supports a showing of causation).

## D. Analysis-Castleberry's Retaliation Claim

Castleberry bases her retaliation claims on the "barrage" of disciplinary charges filed against her shortly after she submitted a complaint to the EEO alleging harassment by her supervisor. Pl's Mem. of Law at 34. Those charges almost immediately

forced her to relinquish her permanent post. She filed her EEO complaint on June 12, 2006, received the disciplinary charges on July 17, and returned to the wheel on August 12.

Castleberry satisfies the causation element of her prima facie case because an allegedly adverse employment action occurred precisely two months after she engaged in protected activity. This is well within the range of temporal proximity established by Second Circuit decisions illustrative of potential causation. *See Treglia v. Town of Manlius*, 313 F.3d 713, 720-21 (2d Cir. 2002) (interval of a "few months" sufficient to indicate causal connection); *Massie v. Metro. Museum of Art*, No. 06 Civ 12905, 2010 WL 3749206, at *14 (S.D.N.Y. 2010) (interval of "one to two months" sufficient to indicate causal connection).

### E. Analysis–Monche's Retaliation Claim

Monche bases her retaliation claims on a series of disciplinary charges and relinquishment of her permanent post, which followed close on the heels of a complaint to the EEO alleging sexual harassment by her male supervisor. Monche filed that EEO complaint on October 5, 2005. On October 6, Monche learned she was to be placed on the wheel. A single day between protected activity and adverse employment action is certainly so proximate that it demonstrates a causal connection.

### F. Analysis–O'Brien's Retaliation Claim

O'Brien claims that she was designated "chronic sick" in March 2006, removed from her permanent post shortly thereafter and received unfair discipline in June 2006 when both she and a male CO permitted an unauthorized civilian to pass through a gate without identification. O'Brien's federal EEOC complaint about that punishment, filed in September 2006, postdates the adverse employment actions taken against her. These adverse

17

employment actions, therefore, cannot be retaliatory as a matter of law and logic. *See, e.g., Slattery v. Swiss Reins. America Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). Because O'Brien cannot show a causal connection between her EEOC complaint and her earlier removal from her post, she does not establish a prima facie case of retaliation.

## G. Analysis–Quick's Retaliation Claim

Quick bases her retaliation claim on her removal from her permanent post on October 4, 2005, slightly over three months after she complained to the EEO, on June 28, that her supervisor sexually harassed her. As noted above, three months is a short enough period of time for a reasonable jury to determine that there was a causal link between her protected activity, filing a complaint based on gender discrimination, and the subsequent adverse employment action.

## H. Analysis–City's Non-Discriminatory Justification

Because four of the five plaintiffs establish a prima facie case of retaliation, under *McDonnell Douglas* the City must present legitimate non-discriminatory reasons for its actions. The City claims that Castleberry and Monche lost their permanent posts and returned to the wheel because of the disciplinary charges against them. Def's Mem. of Law at 13. The City also claims that Quick lost her permanent post because she was designated "chronic sick" and frequently absent and that Adams gave up her permanent post voluntarily because it was too physically taxing. *Id.* at 5, 13.

To satisfy their own burden of showing that the City's proffered justification

is mere pretext, plaintiffs state that the disciplinary charges they received were of "little merit" and should not have resulted in the loss of their permanent posts. Pl's Mem. of Law at 34; *See Ruiz v. County of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (holding that where an employer applies "its criteria for satisfactory job performance in an inconsistent, arbitrary or discriminatory manner, then there is a question of fact as to whether the criteria . . . merely provided a pretext for unlawful discrimination."). Plaintiffs state that COs with health problems were typically accommodated rather than forfeiting their permanent posts. Pl's Mem. of Law at 26. Plaintiffs further state that the explanation offered to Monche and Quick when they lost their permanent posts– that certain posts needed to be reposted in compliance with DOC regulations– had no basis in fact. Pl's Mem. of Law at 27. Plaintiffs therefore demonstrate a triable issue as to the presence of a discriminatory reason for the City's actions.

Consequently, the Court denies summary judgment on the retaliation claims by Adams, Castleberry, Monche and Quick. Summary judgment is granted with respect to the retaliation claim by O'Brien.

## IV

Plaintiffs additionally bring claims for damages based upon an allegedly hostile work environment. The general hostile work environment claims of all five plaintiffs are based upon offensive comments from white male supervisors and upon the bathroom arrangements on Rikers Island which plaintiffs claim are unfairly inhospitable to female COs.[7] In addition, and independent of whether the general hostile work environment claims

---

[7]Plaintiffs do not claim that this conduct constituted direct discrimination against them.

survive, Monche and Quick present stand alone sexual harassment claims. The individual claims of those two plaintiffs are considered separately.

## A. Standards Governing Hostile Work Environment Claims

"[T]o survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 84 (2d Cir. 2010) (internal quotation marks omitted).

Whether an environment is "hostile" or "abusive" depends upon the totality of the circumstances. Factors may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)); *Aulicino*, 580 F.3d at 82 (counseling courts to weigh the "quantity, frequency and severity" of offensive remarks in combination). "Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe" or accompanied by "physically threatening" behavior. *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010).

The test, moreover, has "objective and subjective elements: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Terry*, 336 F.3d at 148 (internal quotation marks omitted). Although the

environment need not be "unendurable," it must be sufficiently hostile that a reasonable employee would find the conditions of her employment altered "for the worse." *Id.*

Hostile work environment claims based upon gender or sexual harassment require that plaintiffs "proffer sufficient evidence to allow a trier of fact to find disparate treatment based on gender" resulting in a severe, pervasive hostile work environment. *Pucino v. Verizon Wireless Commc'n, Inc.*, 618 F.3d 112, 117 (2d Cir. 2010). This may be proven by either harassment in "sex-specific and derogatory terms" that demonstrates hostility to women in the workplace or "circumstantial" evidence "for inferring that incidents sex-neutral on their face were in fact discriminatory." *Id.* at 117-118 (internal quotation marks omitted).

Where "the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer." *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010). For claims under Title VII and the NYSHRL, the employer may be permitted, "subject to proof by a preponderance of the evidence," to raise the *Faragher/Ellerth* affirmative defense to liability.[8] *Id.* "This defense consists of two elements: that (1) 'the employer exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior,' and (2) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

---

[8] The *Faragher/Ellerth* defense does not apply to claims brought under the NYCHRL. *Zakrzewska v. New School*, 620 F.3d 168, 169 (2d Cir. 2010).

**B. Analysis–General Hostile Work Environment**

All five plaintiffs base hostile work environment claims on evidence that racist and sexist remarks by supervisors were commonplace at Rikers. They point to specific examples of offensive conduct, primarily racist and sexist comments made by white male supervisors, and state that such behavior was characteristic of the work environment at Rikers. Plaintiffs also base their hostile work environment claims on the bathroom arrangements at Rikers, claiming that extremely limited toilet access creates an environment that is hostile to women. Several plaintiffs– Adams, Castleberry and Quick–refer to their own experiences working at posts that lacked bathroom facilities, and plaintiffs note that the EEO received complaints from female employees with similar negative experiences. *See* Adams Aff. ¶ 48; Castleberry Aff. ¶ 29; Quick Aff. ¶ 30; Ex. CE, Isaac Tr. 77:3-20. Plaintiffs claim that, as applied, this gender-neutral bathroom policy subjected female COs to extreme discomfort and humiliation.

A hostile environment claim must be "evaluated on the basis of the cumulative effect of the abusive conduct." *Dawson v. County of Westchester*, 373 F.3d 265, 273 (2d Cir. 2004). The cumulative effect of racist and sexist comments, coupled with a bathroom policy with a disproportionate negative impact on female COs, could create an objectively hostile work environment that non-white female employees would find altered for the worse. *See Id.* at 273-74 (holding that "in the prison context especially," derogatory comments may alter the conditions of employment by "compromising [female CO's] status as equals to men"). The incidents described by plaintiffs were more than episodic, and a reasonable jury could find that they were severe and pervasive throughout the period relevant to this case. As a

result, there is a triable issue as to whether racist and sexist comments and the Rikers bathroom policy created a hostile work environment.

Because the DOC employees who engaged in the alleged harassment served in supervisory positions over plaintiffs, their conduct is imputed to their employer, the City. The City claims that it is entitled to the *Faragher/Ellerth* defense because the EEO provided an "effective complaint system" and plaintiffs counter that the EEO "did not function." Def's Mem. of Law at 14; Pl's Mem. of Law at 16. There are triable issues of fact regarding the appropriateness of DOC's response to claims of racist gender-motivated harassment. This defense, though still available at trial, does not entitle the City to summary judgment on plaintiffs' hostile work environment claims.

**B. Analysis–Monche's Sexual Harassment Claim**

With respect to Monche's separate sexual harassment claim, she describes in her affidavit a pattern of aggressive, unwanted sexual advances by Deputy Warden Olivo taking place over eight months, from December 2004 through August 2005. Although Monche discouraged him by mentioning that she was married and leaving his office when he disrobed, he continued to touch her and make sexual noises when he saw her. The City contends that this behavior amounted to "a few incidents" and could not have altered the conditions of her employment. Def's Mem. of Law at 16. However, Monche's affidavit describes the sort of frequent contact that would make any "reasonable woman" severely uncomfortable in the workplace. *See Gorzynski*, 596 F.3d at 102 (holding that seven months of frequent lewd comments about breasts and sex toys, along with habitually grabbing female employees and trying to tickle them, was sufficiently continuous and severe to render

the plaintiff's workplace hostile due to sexual harassment).

Olivo served in a supervisory position over Monche, and so his conduct is imputed to the City. As it does with respect to plaintiffs' general hostile work environment claims, the City contends that it is entitled to the *Faragher/Ellerth* defense. As discussed above, because there are triable issues of fact regarding the appropriateness of DOC's response to claims of sexual harassment the City is not entitled to summary judgment on Monche's individual sexual harassment claim. Monche presents a prima facie case of sexual harassment that may stand independent of any findings with respect to the general hostile work environment claims.

## C. Analysis–Quick's Sexual Harassment Claims

With respect to Quick's individual sexual harassment claim, Quick relies upon a specific instance of sexual harassment: in June 2005 she and a group of inmates arrived at the office of a male supervisor, Matos, who answered the door shirtless and with his pants unzipped. Against Quick's protestations, that supervisor ordered the group to enter.

The law is clear that isolated instances of sexual harassment are insufficient to establish a hostile work environment unless they are "extraordinarily severe." *Kaytor*, 609 F.3d at 547. For example, a single instance of sexual assault and a single, public verbal "tirade" asserting that an employee received her office "only by performing fellatio," have been deemed sufficiently severe. *Petrosino v. Bell Atlantic*, 385 F.3d 210, 224 (2d Cir. 2004); *Howley*, 217 F.3d at 154. In contrast, Matos's conduct, though offensive, "is not sufficiently severe to overcome its lack of pervasiveness." *Mormol*, 364 F.3d at 59. Nor does Quick raise an issue that this incident was so severe that it "unreasonably interfere[d] with [her] work

performance." *Howley*, 217 F.3d at 154. Because Matos's actions did not alter the conditions of Quick's employment, it is not necessary to consider whether his actions may be imputed to his employer. Notwithstanding the EEO finding that her complaint against Matos was substantiated, Quick does not raise an issue of fact on her individual sexual harassment claim under Title VII. Although Quick's claim does not pass muster as a standalone claim, her contentions may still be used to bolster the general hostile work environment claims asserted by all five plaintiffs, and may bear upon the issue of damages.

## V

Unlike plaintiffs' state law claims under the NYSHRL, plaintiffs' claims under the NYCHRL are not analyzed under a framework identical to that applied for their federal claims. Title 8 of the NYCHRL states that it "shall be construed liberally for the accomplishment of the broad and remedial purposes" of that law. Claims under the NYCHRL must receive an "independent liberal construction" that is not "co-extensive" with federal counterparts. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (citing *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 66, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)). "Thus, less egregious conduct than that required under Title VII may support a claim of employment discrimination under the NYCHRL." *Woodard v. TWC Media Solutions, Inc.*, No. 09-CV-3000, 2011 WL 70386, at *9 (S.D.N.Y. 2011). The Court must therefore analyze plaintiffs' employment discrimination, retaliation and hostile work environment claims in light of the more lenient NYCHRL standard. Where the Court has already determined that plaintiffs' claims survive summary judgment under Title VII and the NYSHRL, it is assumed that those claims also satisfy the NYCHRL standard. Consequently,

the Court will only reconsider those claims that failed to pass under the Title VII and NYSHRL standards.

## A. NYCHRL Discrimination Claims

Like Title VII and the NYSHRL, claims of employment discrimination under the NYCHRL are analyzed under the burden-shifting *McDonnell Douglas* framework, and require the same elements for a prima facie case: membership in a protected class, qualification for the position, adverse employment action, and circumstances giving rise to an inference of discriminatory intent. *See Bermudez v. City of N.Y.*, No. 10 Civ. 1162, 2011 WL 1218406, at *10 (S.D.N.Y. 2011). However, in accordance with the broad and remedial purposes of the NYCHRL, where a violation is a "borderline" one under Title VII or the NYSHRL, it may pass muster under the more liberal NYCHRL standard. *Woodard*, 2011 WL 70386, at *9.

Plaintiffs' claims that the City discriminated against them by placing them on the wheel do not present a borderline case. Reexamining these claims in light of the broad and remedial purposes of the NYCHRL, plaintiffs still do not present evidence showing that they experienced an adverse employment action while assigned to the wheel or to less-favorable permanent posts.

## B. NYCHRL Retaliation Claims

Claims of retaliation under the NYCHRL are analyzed under the burden-shifting *McDonnell Douglas* framework. *See Bermudez*, 2011 WL 1218406, at *10. Unlike Title VII and the NYSHRL, retaliation claims under the NYCHRL do not require the plaintiff to prove any materially adverse employment action. Instead, plaintiffs "must prove that

something happened that would be reasonably likely to deter a person from engaging in a protected activity." *Ellis v. City of N.Y.*, No. 08-CV-7605, 2011 WL 3279057, at *9 (S.D.N.Y. 2011). The other elements–participation in a protected activity, defendant's knowledge of the protected activity and causal connection– are the same as those for Title VII and the NYSHRL. *Id.*

As noted above, plaintiffs satisfy the first three elements of their prima facie retaliation case: they participated in a protected activity when they submitted complaints to the EEO, DOC knew of that activity and their placement on the wheel qualified as an adverse employment action for the purposes of their retaliation claims.

O'Brien's Title VII and NYSHRL claims for retaliation fail because her EEO complaint postdated her disciplinary charges and placement on the wheel. The broad remedial purpose of the NYCHRL does not change the requirement for causal connection between the protected activity and the adverse employment action. Consequently, O'Brien does not establish a prima facie case of retaliation under the NYCHRL and summary judgment is granted on this claim.

## C. NYCHRL Hostile Work Environment Claims

Plaintiffs' claims of hostile work environment under the NYCHRL need not establish "severe and pervasive" conduct to establish liability, so long as the behavior complained of is worse than "petty slights and trivial inconveniences." *Mihalik v. Credit Agricole Cheuvreux N. America, Inc.*, No. 09 Civ. 1251, 2011 WL 3586060, at *9 (citing *Williams*, 872 N.Y.S.2d at 31). For sexual harassment claims, the inquiry should "'focus on unequal treatment based on gender' and prevent 'too much unwanted gender-based conduct to

continue befouling the workplace." *Id.* Courts should "examine broadly whether different terms, conditions and privileges of employment" were imposed based on gender. *Id.* at *6.

Quick's sexual harassment claim also fails under this standard. A reasonable jury would not find that the conduct of her shirtless male supervisor, though "boorish and offensive," was so grave that it would alter the conditions of Quick's employment. *Mihalik*, 2011 WL 3586060, at *10 (holding that several months of sporadic comments and two isolated incidents of sexual advances did not create a hostile work environment under NYCHRL).

## VI

In addition to their claims that the City is vicariously liable under Title VII, the NYCHRL and the NYSHRL, plaintiffs bring a *Monell* claim pursuant to 42 U.S.C. § 1983 based on alleged violations of their Fourteenth Amendment rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Unlike Title VII, a "municipality may not be held liable in an action under 42 U.S.C. § 1983 for actions alleged to be unconstitutional by its employees below the policymaking level solely on the basis of *respondeat superior*." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). Rather, to hold a municipality liable under § 1983, a plaintiff must show "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Id.*

Plaintiffs contend that the EEO has "simply ceased to function" because it has a policy of requiring independent corroboration for all complaints, absent which the complaint will be summarily dismissed. This policy, they contend, results in widespread constitutional violations because DOC employees feel free to discriminate and harass with impunity. Pl's Mem. of Law at 40, 48.

The existence of the corroboration policy is not in dispute. The Deputy Director of the EEO attested to its existence at his deposition:

> Q. Was it the practice of the department, where there was no corroborating proof, always to find a claim unsubstantiated?
>
> A. Generally.
>
> Q. So that the department didn't make any judgment about who to believe?
>
> A. That's correct.

Ex. CE 12, Isaac Tr. 76:15-77:8.

He also testified that this policy reflected the standard insisted upon by the Deputy Commissioner in charge of the EEO, Luis Burgos. Ex. CE 12, Isaac Tr. 171:12-172:7. The City itself acknowledged the policy in its reply memorandum of law: "for the DOC EEO office to not require corroboration of an EEO complaint would mean that any [CO] could weave a complaint out of whole cloth against any supervisor which would be virtually guaranteed to be substantiated" and the "DOC EEO was liberal in their 'corroboration' requirement." Def's Reply Mem. of Law at 14.

Notwithstanding the existence of the corroboration policy, the City argues (1) that Burgos does not have policymaking authority, and (2) that the policy does not "discriminat[e] against females of color." Def's Reply Mem. of Law at 12-13.

With respect to the first argument, the official in question need not be a policymaker for all purposes, but rather he must be "responsible under state law for making policy in that area of the [municipality's] business"; a policy maker must be authorized to make "*final* policy" that is not "subject to review" by higher ranking officials. *City of St. Louis*

*v. Praprotnik*, 485 U.S. 112, 122, 127 (1988).  The deposition of the EEO Deputy Director states that Burgos had the authority to insist upon final EEO policies.  *See* Ex. CE 12, Isaac Tr. 171:12-172:7.  The City has not submitted any contrary evidence.

With respect to the second argument, the City misunderstands the nature of *Monell* liability.  It is not necessary to show that the policy in question was *intended* to cause constitutional violations.  Rather, it is sufficient to show that policymakers' awareness of the consequences of their policies "amounts to deliberate indifference to the constitutional rights of persons with whom [lower-level employees] come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  A policymaker may be said to have acted deliberately indifferent where he or she knows that "the inadequacy [of the existing policy was] likely to result in the violation of constitutional rights," such that the need for action was "obvious."  *Id.* at 390.

Plaintiffs have offered sufficient evidence of deliberate indifference.  An EEO report reveals that 112 claims of race discrimination, retaliation and sexual harassment were filed in fiscal year 2006; only five were substantiated.  *See* Ex. CE 13.  Morever, the Deputy Director of the EEO acknowledged that the corroboration policy led to legitimate discrimination complaints being dismissed: "[T]here could have been something that was–we thought was so horrific or something that was so specific that it probably did happen, but because the standard was you had to have [corroboration]. . . we could not substantiate the complaint.  And that's generally what would happen."  Ex. CE 12, Isaac Tr. 171:12-172:7.  A reasonable jury could infer deliberate indifference from that evidence. *See Vann v. City of N.Y.*, 72 F.3d 1040, 1049 (2d Cir. 1995) (holding that deliberate indifference may be inferred if repeated complaints of civil rights violations are "followed by no

meaningful attempt to investigate or forestall further incidents"). A reasonable jury could infer deliberate indifference because the EEO took no steps to investigate uncorroborated complaints, for example by speaking with the person who was the subject of a complaint.

The City also takes issue with the remaining elements of *Monell* liability – causation and an underlying constitutional violation–and the Court will address them briefly.

With respect to causation, plaintiffs will bear the burden of proving at trial that the corroboration policy caused employees to engage in sexual harassment because they knew that their behavior, unless corroborated, would go unpunished. No doubt that will be a heavy burden, but the Court cannot say, as a matter of law, that no reasonable jury could find such causation. For example, Monche stated in her affidavit that although 11 complaints were filed against Olivo over the course of ten years, the supervisor who allegedly sexually harassed her, only one had been substantiated; as a result "he always seemed to feel that he was free to behave any way he liked." Monche Aff. ¶¶ 18, 20. The City argues that the causal link between the number of unsubstantiated complaints and employees' behavior is too attenuated, but the law only requires that the policy in question be a "moving force" of the constitutional violation. *Monell*, 436 U.S. at 694. Whether that is the case is an argument for the jury.

With respect to the underlying constitutional violation, the same behavior that gives rise to a Title VII claim amounts to a constitutional violation under the Equal Protection Clause if the behavior is attributable (as it is here) to a state actor. *See Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). Since the Court has found that some of plaintiffs'

31

Title VII claims may proceed to the jury, they are also entitled to a jury trial as to whether their constitutional right to equal protection was violated.

In sum, if the jury determines that plaintiffs' constitutional rights were violated because they were harassed, the jury would then be required to make the following determinations with respect to the *Monell* claim: (1) whether the corroboration policy in fact caused those violations because employees felt they could harass subordinates without being punished, and (2) whether the City was deliberately indifferent to widespread constitutional violations because harassment was obvious but the EEO took no responsive action. The City is therefore not entitled to summary judgment on the *Monell* claim.

## VII

For the foregoing reasons, the City's motion for summary judgment is granted with respect to employment discrimination claims for all plaintiffs under Title VII, the NYSHRL and the NYCHRL. In addition, the City's motion for summary judgment is granted with respect to O'Brien's federal and state law retaliation claims because the allegedly retaliatory actions took place before O'Brien engaged in protected activity by filing an EEO complaint. The City's motion for summary judgment is also granted with respect to Quick's stand alone sexual harassment claim.

Summary judgment is denied with respect to the federal and state law retaliation claims by Adams, Castleberry, Monche and Quick. There are issues of fact regarding whether assignment to the wheel or to non-preferred posts is the kind of employment action that would dissuade an employee from filing a complaint against a supervisor with the EEO; whether plaintiffs were removed from their permanent posts as a

consequence of having submitted such complaints; and whether the City had legitimate reasons for placing plaintiffs on the wheel and in non-preferred posts or whether its motivations were in fact discriminatory.

Summary judgment is denied with respect to plaintiffs' federal and state law hostile work environment claims and for Monche's individual sexual harassment claim. There are issues of fact regarding whether derogatory comments by supervisors and the bathroom policy at Rikers were so severe as to create a pervasive hostile work environment and whether Olivo's treatment of Monche was so severe and pervasive that it resulted in a hostile work environment that interfered with her conditions of employment.

Summary judgment is denied with respect to plaintiffs' *Monell* claims. If the jury determines that plaintiffs' constitutional rights were in fact violated because they were harassed, the case will proceed to trial on the following issues: (1) whether the EEO corroboration policy caused those violations because supervisors believed they could harass subordinates with impunity and (2) whether the City was deliberately indifferent to the need to address frequent harassment claims.

**SO ORDERED.**

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 22, 2011